**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**Eastern Division**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **PACIRA BIOSCIENCES, INC.,** | ) ) ) |
|  | ) **Case No.** |
| **Relator-Plaintiff,** | ) |
|  | ) **COMPLAINT** |
| **v.** | ) |
|  | ) **JURY TRIAL DEMANDED** |
| **NEPHRON PHARMACEUTICALS CORPORATION, QUVA PHARMA, INC., VENTIS PHARMA, INC., INFUSYSTEM HOLDINGS, INC., and NUBRATORI, INC., d/b/a NUBRATORI RX,** | ) **FILED UNDER SEAL PURSUANT TO** ) **31 U.S.C. § 3730** ) ) ) |
| **Defendants.** | ) ) ) ) ) ) |

On behalf of the United States, Relator Pacira BioSciences, Inc. ("Pacira" or "Relator"), brings this action under the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, to recover damages and civil penalties against Defendants Nephron Pharmaceuticals Corporation ("Nephron"), QuVa Pharma, Inc. ("QuVa"), and Ventis Pharma, Inc. ("Ventis," collectively, the "Compounders"), InfuSystem Holdings, Inc. ("InfuSystem"), and Nubratori, Inc., d/b/a Nubratori RX ("Nubratori"), for their fraud on the federal government, and alleges as follows:

## INTRODUCTION

1.      This lawsuit aims to stop history from tragically repeating itself again at the hands of shady drug compounders pushing illegal drugs on unsuspecting patients and providers to massively defraud our federal government.

2.      More than a decade ago, our Nation suffered the largest public health crisis ever caused by a pharmaceutical drug.  Putting profits ahead of patients, a drug compounding operation triggered a sprawling meningitis outbreak by mass-distributing contaminated steroid injections to patients around the country.  That outbreak left 100 patients dead and many more sick in its wake.

3.      To make sure such a needless tragedy never happened again, Congress swiftly enacted the Drug Quality And Security Act – a.k.a., the DQSA – to increase federal regulatory oversight over drug compounders and to restrict their ability to mass-produce drugs.  That Act was intended to buttress the core policy imperative of our Federal Drug and Cosmetic Act ("FDCA") to safeguard the public health by ensuring drugs we rely on are safe and effective.

4.      Despite Congress's best efforts, our Nation is once again staring down a grave public health crisis at the hands of enterprising but unethical drug compounders.  In their own remarkable words, these compounders are perpetrating a "Grand Scheme" to reap windfall

-1-

profits at the expense of patient safety and our public fisc by mass-producing and distributing novel and untested drugs in stark violation of the FDCA and DQSA's express terms.

5.     With this suit, Relator Pacira therefore aims to stop these compounders, and those in league with them (collectively, the Defendants), from defrauding our government, putting unwitting patients in harm's way, and, ultimately, causing another public health tragedy.  Pacira thus brings this Complaint to stop Defendants' ongoing, unlawful, and fraudulent conduct and remedy the serious harms they have caused – and continue to cause – the United States and the public to suffer.

6.     Pacira is a leading provider of non-opioid pain management solutions and works to advance and improve patient outcomes.  Among other products, Pacira markets and manufactures EXPAREL®, the only drug approved by the Food and Drug Administration ("FDA") on the market that may be used to reduce post-surgical pain.  EXPAREL® is injected at the surgical site during surgery or shortly thereafter to manage and reduce post-surgical pain for several days – all without the use of dangerous and addictive opioids.  As a result of the process to secure FDA approval, EXPAREL® has undergone rigorous testing, studies, and analysis to confirm its efficacy and safety by the government and scientific community.

7.     Recognizing the high and increasing demand for non-opioid analgesics, Defendants have entered the marketplace deploying a brazen and unlawful "Grand Scheme" to induce providers to buy their unapproved and unlawful drugs and cause them to submit false claims for payment to our federal government.

8.     The Compounders – Nephron, QuVa, and Ventis – along with Ventis' marketing and distribution partners, InfuSystem and Nubratori, have marketed, developed, and sold new drugs for post-surgical relief *without* obtaining any FDA approval or completing any studies to

validate their safety and efficacy.  These drugs contain Schedule III controlled substances and unapproved dosage strengths of substances that pose serious safety risks to patients.

9.      To circumvent FDA approval requirements established under the FDCA, the Compounders purport to rely on the narrow "503B exemption."  Under that exemption, a compounded drug may be manufactured and sold without FDA approval, but only if that drug is expressly identified on the FDA's drug shortage or clinical need lists.

10.     Even though none of the Compounders' drugs appear on either of the required FDA lists for the 503B exemption to apply, Defendants have nevertheless programmatically and falsely advertised that they meet that statutory exemption.

11.     Defendants have also developed aggressive – and unlawful – practices and policies designed to mislead providers into believing their drugs have been approved by the FDA and otherwise comply with federal law when they are in fact unapproved and illegal.

12.     In public advertisements, sales presentations, and other statements made to providers, Defendants have made knowingly false statements about the lawfulness of their drugs. While none of their drugs have been approved by the FDA, Defendants have distributed misleading advertisements and marketing materials that are intended to and do imply the FDA has approved them.  In some instances, the Defendants have gone so far as to represent directly to providers that their drugs are FDA-approved – despite knowing that is false.

13.     Using these false and misleading advertisement policies and strategies, Defendants have knowingly induced providers to purchase their drugs on the mistaken belief that they have been approved by the FDA and/or otherwise comply with the FDCA.

14.     Had providers known these drugs neither received FDA approval nor complied with federal law, they would likely never have purchased and used them.  Using unapproved

drugs that have not been evaluated for efficacy and safety presents inherent – and needless – risks to patient safety.  Nor are providers entitled to reimbursement for unapproved drugs.

15.     Yet, in reliance on Defendants' false representations, the providers have submitted claims for reimbursement to federal healthcare programs – Medicare, Medicaid, TRICARE, and the Veterans Health Administration – for Compounders' unapproved and unlawful drugs.

16.     In support of these claims, providers must certify that services and drugs are properly reimbursable and comply with the FDCA.  Compliance with the FDCA is therefore a material requirement and condition of payment for claims submitted to the federal government.

17.     However, when providers submit claims for reimbursement of the Compounders' drugs, they falsely certify that the drugs are reimbursable and comply with the FDCA, materially false certifications that are caused by Defendants' scheme.

18.     These false certifications are likely to go undetected by the government because many federal healthcare programs reimburse inpatient hospital services based on bundled codes billed on claim forms that do not identify the individual drugs and supplies.  The government may thus be unable to detect that these unlawful drugs are part of the package of items and services submitted for reimbursement.

19.     As a result, the government is being misled by affirmative misrepresentations and omissions in these claims, which were caused directly and knowingly by the Defendants' conduct.

20.     Defendants have also caused hospital providers to submit false records to the federal government that are material to the payment of claims.  Hospitals must submit cost

reports that identify the drugs and supplies they use each year, and the federal government relies on the reports to determine reimbursement rates.

21.     In submitting their cost reports, hospitals certify that the information is accurate and complies with federal law – including that the services and drugs were provided in compliance with Medicare laws and regulations.  Medicare does not, however, allow hospitals to obtain reimbursement for drugs that do not comply with the FDCA.

22.     On information and belief, hospitals have included the Compounders' drugs in their reports, and, in doing so, certified that they are properly reimbursable and comply with the FDCA.  Because all of the Compounders' drugs violate the FDCA and are not reimbursable under federal law, however, it is false and improper for the hospitals to include them in their reports.

23.     As a result of the hospitals' false statements, the federal government is allocating funds for the reimbursement of unlawful and unapproved drugs when it sets reimbursement rates and payments for provider claims.

24.     Defendants have thus knowingly caused – and continue to cause – providers to make materially false statements and submit false claims for payment in violation of the FCA.

25.     The harm that Defendants' conduct has caused to the federal government is substantial and ongoing.  The federal government has approved and paid (and continues to approve and pay) *hundreds of thousands* of claims for the Compounders' unapproved and unlawful drugs based on false claims submitted by providers and hospitals.

26.     In addition to the substantial economic harms that Defendants have caused to the federal government, they have also imperiled the health, safety, and welfare of the American public.

27.     Through their continued schemes and distribution campaigns, Defendants have distributed unapproved drugs into interstate commerce that have not undergone any analysis or testing to determine their safety and efficacy.

28.     Providers and hospitals are using these unapproved and unsafe drugs to treat unwitting patients, thereby putting their health and safety unknowingly into grave danger. Unsuspecting patients around the country are thus being subjected to Defendants' unlawful drugs and exposed to their inherent, but unknown, health risks.

29.     Relator therefore brings this action on behalf of the United States to stop Defendants from defrauding the government and putting the public at risk and to remedy the serious harms their violations of the FCA have caused.

## PARTIES

30.     Relator Pacira is a pharmaceutical company incorporated under the laws of Delaware with its principal place of business in Tampa, Florida.

31.     Pacira is a leading provider of non-opioid pain management solutions and works to advance and improve patient outcomes.

32.     Among other products, Pacira markets and manufactures EXPAREL®, an FDA-approved and market-leading local analgesic.

33.     Defendant Nephron is incorporated in Florida with its principal place of business in West Columbia, South Carolina.

34.     Nephron manufactures, markets, and sells "BKK," a compounded drug consisting of syringes of ketorolac, ketamine, and bupivacaine for combined use.

35.     Nephron also manufactures, markets, and sells "RKK," a compounded drug consisting of syringes of ketorolac, ketamine, and ropivacaine for combined use.

36.     Defendant QuVa is incorporated in Delaware with its principal place of business in Sugar Land, Texas.

37.     QuVa manufactures, markets, and sells R.E.C.K., a compounded drug consisting of ropivacaine, epinephrine, clonidine, and ketorolac syringes for combined use.

38.     Defendant Ventis is incorporated in Delaware with its principal place of business in Newport Beach, California.

39.     Ventis sells the compounded drugs Enduracaine™ and Endura-Kit™, which consist of epinephrine, tetracaine, and lidocaine for combined use.

40.     Defendant InfuSystem is a sales and marketing company incorporated in Delaware with its principal place of business in Madison Heights, Michigan.

41.     InfuSystem maintains a partnership with Ventis for the marketing and sale of Endura-Kit™ and Enduracaine™ products.

42.     Defendant Nubratori is a wholesale pharmaceutical distributor incorporated in California with its principal place of business in Torrance, California.

43.     Nubratori manufactures and distributes Ventis' Enduracaine™ and Endura-Kit™ products.

## JURISDICTION AND VENUE

44.     Pacira brings this action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").

45.     This Court therefore has subject matter jurisdiction over this matter pursuant to 31 U.S.C. § 3732(a), which grants federal courts jurisdiction over "[a]ny action" for violations of the FCA.  *See* 31 U.S.C. §§ 3730(b) & 3732(a).

46.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the "laws" of the United States.

47.     The Court has personal jurisdiction over Pacira because it transacts business in the Commonwealth of Massachusetts.  *See* M.G.L. c. 223A § 3(a); 31 U.S.C. § 3732(a).

48.     The Court also has personal jurisdiction over Defendants.

49.     At all times material to the allegations in this Complaint, Defendants have regularly conducted and transacted business within the Commonwealth of Massachusetts, including by advertising and promoting their drugs within the Commonwealth, calling on and selling their drugs to providers and hospitals within the Commonwealth, and generating revenue from the sale of their drugs within the Commonwealth.  *See id.*

50.     Defendants are also putting patients at risk in the Commonwealth of Massachusetts.

51.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to Relator's claims under the FCA occurred in this District.

52.     Defendants all "transact[ ] business" in the Commonwealth of Massachusetts and have caused the submission of false claims and statements in this District, among other unlawful conduct.  *See* 31 U.S.C. § 3732(a); 28 U.S.C. § 1391.

53.     Pursuant to 31 U.S.C. § 3730(b)(2), this Complaint has been filed in camera, will remain under seal for 60 days, and will not be served on Defendants until the Court so orders.

54.     Pursuant to 31 U.S.C. § 3730(b)(2) and Federal Rule of Civil Procedure 4(i), Relator has served a copy of the Complaint along with a written disclosure of substantially all material evidence in its possession on the Attorney General of the United States and the United States Attorney for the District of Massachusetts.

55.     None of the allegations set forth in this Complaint are based on a public disclosure of allegations in a federal criminal, civil, or administrative hearing, in a congressional,

administrative or General Accountability Office, report, hearing, audit or investigation, or from the news media.

56.     To the extent any allegations have been publicly disclosed, Relator is an "original source" under 31 U.S.C. § 3730(b)(2), possesses independent knowledge of the allegations set forth in the Complaint, and has voluntarily provided the information to the Department of Justice before filing suit.

## STATUTORY AND REGULATORY BACKGROUND

### I.      The Federal Food, Drug, And Cosmetic Act.

57.     The core purpose of the FDCA is simple but profound: protect the "health and safety of the public" by regulating the manufacturing, marketing, and distribution of drugs. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014).[1]

58.     To achieve that critical policy objective, the FDCA empowers the FDA to develop policies and programs designed to "promote the public health" and ensure drugs are "safe and effective."  21 U.S.C. § 393(b).

59.     The FDA thus oversees the process for approving any "new drugs" that are developed for human use and consumption.  *Id.* § 355.

60.     "New drugs" are those that are not widely recognized as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.  *Id.* § 321(p)(1).

61.     The FDCA prohibits any person from introducing or delivering "into interstate commerce" any "new drug" unless the drug is approved by the FDA.  *Id.* § 355(a).

62.     To obtain approval of a new drug, the FDA relies on an extensive new drug approval framework and process.

---

[1]  U.S. Food & Drug Admin., *80 Years of the Federal Food, Drug, and Cosmetic Act*, https://www.fda.gov/about-fda/fda-history-exhibits/80-years-federal-food-drug-and-cosmetic-act (July 11, 2018).

63.     An applicant must satisfy extensive application requirements that require substantial investments of capital and resources.  *See id*. § 355(b).[2]

64.     As part of its review process, the FDA analyzes the target condition and available treatments, assesses the "benefits and risks from clinical data," and considers "strategies for managing risks" posed by the new drug.[3]

65.     The FDA also requires an applicant to submit reports of investigations into the drug's safety, a list of the drug's components, a description of the methods used to manufacture, process, and pack the drug, as well as samples of the drug and its proposed labeling.  *See id.* § 355(b).

66.     An applicant must also submit results from two "well-designed" clinical trials.[4] A well-designed trial follows a three-phase process beginning with a small-scale trial in its first phase and progressing to a large-scale trial in its third and final phase.[5]

67.     Given the detailed and time consuming review, the approval process can take over a decade and cost tens of millions of dollars to complete.[6]

68.     This thorough and costly application and review process to obtain approval for a new drug is vital to safeguarding patients and thereby advancing the FDCA's animating purpose: To protect the health and safety of the American public.[7]

---

[2]  Bright Focus Foundation, *FDA Approval Process*, https://www.brightfocus.org/clinical-trials/how-clinical-trials-work/fda-approval-process (Sept. 2, 2021).

[3]  *Id.*

[4]  U.S. Food & Drug Admin., *Development & Approval Process*, https://www.fda.gov/drugs/development-approval-process-drugs (Aug. 8, 2022).

[5] U.S. Food & Drug Admin., *Step 3: Clinical Research*, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research (Jan. 4, 2018).

[6]  Olivier J. Wouters et al., *Estimated Research and Development Investment Need to Bring a New Medicine to Market, 2009-2018*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION 844, 848 (Mar. 2020), *available at* https://jamanetwork.com/journals/jama/fullarticle/2762311#:~:text=Based%20on%20data%20for%2063,estimated%20to%20be%20%20%241559%20million.

69.     The application and review process allows the FDA to assess the "known and potential risks" that a new drug poses to the American public.[8]

70.     The application and review process also ensures that drugs are approved based on sound science rather than drug manufacturers' "quackery."[9]

71.     And the application and review process ultimately ensures medical professionals have the "information they need to use medicines wisely" – that is, make informed and sound prescribing decisions for patients.[10]

72.     ***The 503B Exemption.***  The FDCA provides a very narrow exemption to new drug approval requirements for drugs that are "compounded" by registered "outsourcing facilities." 21 U.S.C. § 353b.  This exemption is commonly referred to as the "503B exemption."

73.     "Compounding" refers to "combining, admixing, mixing, diluting, pooling, reconstituting, or otherwise altering of a drug or bulk drug substance to create a drug."  *Id.* § 353b(d)(1).

74.     Through compounding, a pharmacy can develop customized and sterile medications tailored to patient needs and requirements, such as allergens or dosage restrictions.[11]

75.     Prior to 2013, there was little federal oversight of compounding pharmacies.

---

[7]  U.S. Food & Drug Admin., *80 Years of the Federal Food, Drug, and Cosmetic Act,* https://www.fda.gov/about-fda/fda-history-exhibits/80-years-federal-food-drug-and-cosmetic-act (July 11, 2018).
[8]  U.S. Food & Drug Admin., *Development & Approval Process: Drugs,* https://www.fda.gov/drugs/development-approval-process-drugs#FDA (Aug. 8, 2022).
[9]  *Id.*
[10]  *Id.*
[11]  GoodRx Health, *What Are Compounding Pharmacies?*, https://www.goodrx.com/healthcare-access/pharmacies/what-is-compounding-pharmacy (Nov. 22, 2021).

76.     In fact, compounded drugs historically did not require FDA approval, meaning they did not undergo premarket review for safety, effectiveness, and quality before being sold and used.

77.     But Congress changed that in 2013 in response to the public health crisis caused by the New England Compounding Center ("NECC") tragedy.  That compounding pharmacy distributed and administered contaminated drugs that resulted in over 100 patient deaths and 14 criminal indictments against NECC executives.[12]

78.     To avoid a repeat of that tragedy, Congress amended the FDCA with the DQSA to ensure greater federal regulatory oversight over compounding pharmacies and to restrict their ability to mass-produce drugs.  *See* Pub. L. 113-54 (2013).[13]

79.     Among other amendments to the FDCA, with the 503B exemption, the DQSA carefully restricts the circumstances in which a compounding pharmacy can develop and sell drugs without first obtaining FDA approval.

80.     Under the 503B exemption, "outsourcing facilities," or compounders, may sell drugs compounded from bulk drug substances without FDA approval only if they meet certain conditions.  21 U.S.C. § 353b.

81.     An "outsourcing facility" is a registered facility that compounds "sterile drugs" and "complies with all of the requirements" of the Section 503B exemption.  *Id.* § 353b(d)(4)(A).

82.     Under Section 503B, an outsourcing facility is exempt from the FDCA's new drug approval requirements if (1) the drug compounded from "bulk drug substances" appears on

---

[12]  Press Release, U.S. Dep't. of Justice, *14 Indicted in Connection with New England Compounding Center and Nationwide Fungal Meningitis Outbreak* (Dec. 17, 2014), *available at* https://www.justice.gov/opa/pr/14-indicted-connection-new-england-compounding-center-and-nationwide-fungal-meningitis.
[13]  *National Defense Authorization Act for Fiscal Year 2014*, 159 Cong. Rec. S8071-04 (2013) (Statements of Senators Lamar Alexander and Mark Warner).

the FDA's drug shortage list ("Drug Shortage List"), or (2) if the "bulk drug substances" appear on the FDA's list of bulk drug substances for which it has determined there is a "clinical need" ("Clinical Need List").  *Id.* § 353b(a)(2)(A)(i)-(ii).

83.    A bulk drug substance is any substance "intended for incorporation into a finished drug product" and "intended to furnish pharmacological activity or other direct effect in the diagnosis" or "treatment" of a patient's condition.  *Id.* § 353b(a)(2); 21 C.F.R. §§ 207.1 & 207.3.

84.    The Drug Shortage List provides an "up-to-date list of drugs" the FDA has determined are in short supply in the United States.  21 U.S.C. § 356e.[14]

85.    If an FDA-approved drug is on the Drug Shortage list, it may be compounded by a registered outsourcing facility.[15]

86.    However, compounded drug products lack FDA approval.[16]

87.    Similarly, the FDA maintains the Clinical Need List on an ongoing basis and evaluates bulk drug substances that are nominated for inclusion on the list via the Federal Register.[17]

88.    When assessing bulk drug substances for inclusion on the Clinical Need List, the FDA applies a multi-step inquiry.

89.    The FDA will assess whether each nominated bulk drug substance is a "component" of an FDA-approved drug.[18]  If so, the FDA will determine whether a "basis"

---

[14]  U.S. Food & Drug Admin., *FDA Drug Shortages*, https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm (last visited January 20, 2023).

[15]  U.S. Food & Drug Admin., *Temporary Policy for Compounding of Certain Drugs for Hospitalized Patients by Pharmacy Compounders not Registered as Outsourcing Facilities During the COVID-19 Public Health Emergency: Guidance For Industry*, at 2 https://www.fda.gov/media/137125/download (May 21, 2020).

[16]  *Id.* at 3.

[17]  U.S. Food & Drug Admin., *503B Bulks List*, https://www.fda.gov/media/120692/download. (Jan. 27, 2022).

exists to include the nominated bulk substance on the Clinical Need List by assessing the "properties" and "safety issues" of the substance, evidence of the substance's effectiveness, and "current and historical use" of the substance.[19]

90.     In addition to identifying certain drugs, the Drug Shortage List and Clinical Need List specify the approved dosage of the drugs and substances.

91.     Accordingly, an outsourcing facility cannot satisfy the 503B exemption simply by combining FDA-approved drugs or "bulk drug substances" that are included on either list, or at varying dosages, to sell an unapproved compounded drug.  *Id.* § 353b(a)(2)(A)(i)-(ii).

92.     In other words, a compounder cannot meet the 503B exemption just by combining drugs or bulk substances on the lists to create a new combined product.  *See id.*

93.     Indeed, the FDA has made clear that a combined product is distinct from its individual components.  Under the so-called "Combination Rule," the FDA will only permit the sale of a combination of two or more drugs when each component "makes a contribution" to the claimed effects and the "dosage of each component" is such that the "combination is safe and effective."  21 C.F.R. § 300.50.

94.     The combined drug must further undergo FDA review and studies to support its efficacy and safety before it can be sold and used.  *See id.*

95.     Even still, because compounded drug products under the 503B exemption are not FDA-approved, they have not undergone FDA premarket review for safety, effectiveness, and quality.[20]

---

[18]  U.S. Food & Drug Admin., *Evaluation of Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry*, at 12, https://www.fda.gov/media/121315/download (Mar. 2019).
[19]  *Id.*

96.     As a result, they may pose "more significant risks" to the American public compared to FDA-approved drugs.[21]

97.     The FDA has also repeatedly expressed concern that outsourcing facilities can "grow into conventional manufacturing operations making unapproved new drug products without complying" with federal law and requirements.[22]

98.     For that reason, an outsourcing facility must strictly comply with the 503B exemption to be exempted from FDA approval requirements and distribute a new, unapproved drug.

99.     ***Misbranding And Labeling.***  The FDCA further governs the branding and labeling of all drugs.  *See* 21 U.S.C. § 352.

100.     The statute prohibits the "misbrand[ing]" of drugs – that is, any "labeling" considered "false or misleading in any particular."  *Id.* § 352(a)(1); *see id.* § 352(bb) (applying misbranding provisions to "compounded drugs").

101.     "Labeling" is defined broadly to include "all labels and other written, printed, or graphic matter," *id.* § 321(m), as well as "brochures, booklets, mailing pieces, . . . price lists, catalogs . . . literature, and reprints," 21 C.F.R. § 202.1(l)(2).

---

[20]  U.S. Food & Drug Admin., *Temporary Policy for Compounding of Certain Drugs for Hospitalized Patients by Pharmacy Compounders not Registered as Outsourcing Facilities During the COVID-19 Public Health Emergency; Guidance For Industry*, at 3, https://www.fda.gov/media/137125/download (May 21, 2020).

[21]  U.S. Food & Drug Admin., *FDA's Human Drug Compounding Progress Report*, https://www.fda.gov/files/drugs/published/Compounding-Safety-Report---2017.pdf, at 8 (Jan. 2017).

[22]  U.S. Food & Drug Admin., *Evaluation of Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry*, https://www.fda.gov/media/121315/download, at 5 (2019).

102.    Any advertisement that states or suggests a drug meets the FDA's approval requirements, complies with the FDCA, or has been approved by the FDA is false or misleading if such statements are not true.  *Id.*

103.    An advertisement for a drug is also misleading if it "contains a representation or suggestion . . . that a drug is better, more effective . . . [or] safer than has been demonstrated by *substantial evidence* or *substantial clinical experience*."  *Id.* § 202.1(e)(6)(i) (emphases added).

104.    "Substantial evidence of safety and effectiveness" requires "adequate and well-controlled investigations, including clinical investigations . . . by experts qualified by scientific training and experience to evaluate the safety and effectiveness of the drug involved, on the basis of which it can be fairly and responsibly concluded by such experts that the drug is safe and effective for such uses."  *Id.* § 202.1(e)(4)(ii)(b).

105.    "Substantial clinical experience" requires "adequate documentation in medical literature or other data . . . on the basis of which it can be fairly and responsibly concluded by qualified experts that the drug is safe and effective for such uses."  *Id.* § 202.1(e)(4)(ii)(c).

106.    Thus, an advertisement for a drug that makes statements or claims about the drug's safety, capabilities, or effectiveness, or its superiority to a competing drug, is false or misleading if the drug has not undergone any serious trials or scientific validation.  *See id.*

II.    **Federal Government Healthcare Programs.**

A.    **Medicare.**

107.    Enacted in 1965 as part of the Social Security Act, Medicare is a federal government health program that provides healthcare coverage and payment for the elderly and disabled.

108.    Through health programs like Medicare, the federal government uses federal funds to pay and reimburse providers.

109.    The Centers for Medicare and Medicaid Services ("CMS") administers Medicare.

110.    Medicare is divided into different "Parts" that cover core segments of patient care.

111.    Medicare Part A covers "inpatient care in hospitals, skilled nursing facility care, hospice care, and home health care."[23]  42 U.S.C. § 1395c.

112.    Medicare Part B applies to outpatient care and services, including durable medical care, drugs, and general services from doctors and other providers.  *See id.* § 1395k.

113.    Under Parts A and B, Medicare only reimburses for drugs that are "*reasonable and necessary* for the diagnosis or treatment of illness or injury."  *Id.* § 1395y(a)(1)(A) (emphasis added).

114.    A "reasonable and necessary" drug is "safe and effective," not experimental or investigational.  42 C.F.R. § 405.201(b).

115.    Only drugs that have received approval from the FDA are considered "safe and effective."  Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 1 § 30.

116.    CMS thus denies coverage for drugs that the FDA has not approved and do not otherwise comply with the FDCA.  *See id.* at ch. 15 § 50.4.1.

> ### 1.    <u>Medicare Part A Coverage.</u>

117.    Under Medicare Part A, CMS reimburses hospitals for the operating costs of inpatient services furnished to beneficiaries through fixed, bundled payments under the "prospective payment system."  42 C.F.R. § 412.1(a)(1).

---

[23]  CMS, *Parts of Medicare*, https://www.medicare.gov/basics/get-started-with-medicare/medicare-basics/parts-of-medicare (last visited January 20, 2023).

118.    Under this system, CMS reimburses hospitals on a "predetermined amount per discharge for inpatient hospital services furnished to Medicare beneficiaries," which is based on the average charges across hospitals for a specific diagnosis. *Id.* §§ 412.2 & 412.4.

119.    For example, items and services provided to a patient who is admitted to the hospital with a diagnosed need for a knee replacement are billed under a code associated with that diagnosis.  Under that code, the payment amount will be the same across patients with the same diagnosis, regardless of the actual quantity of items and services, including drugs, supplies, and services, that are used in the patient's care.

120.    As such, drugs, supplies, and services are not itemized on a claim form.

121.    "Drugs" are specifically included in the prospective payment system and reimbursed as part of the bundled payment to the hospital for the patient's care.  Medicare Claims Processing Manual, ch. 17, § 10.

122.    The predetermined amount for reimbursement is based on the Diagnosis Related Group Codes ("DRG"), a classification system of inpatient hospital charges defined by CMS. *See* 42 C.F.R § 412.60; 42 U.S.C. § 1395ww(d)(1)(A)(iii).

123.    DRG rates are calculated using costs incurred by a hospital in preceding years for a procedure and supplies, including drugs.[24]

124.    Each year, CMS reviews and adjusts (if necessary) the DRG rates to account for changes in resources and care by hospitals.  42 C.F.R. §§ 412.60 & 412.64.

125.    As part of that effort, hospitals submit cost reports to CMS that the agency uses to adjust DRG rates for the next year.  *See* Hospital Cost Report Form, CMS 2552-10.

---

[24] CMS, *MS-DRG Classifications and Software*, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/MS-DRG-Classifications-and-Software (last visited January 20, 2023).

126.    CMS relies on the cost reports to determine how much federal funding to allocate in one year for reimbursement of the procedures, drugs, and supplies.  *See* 42 U.S.C. § 1395ww(d)(1)(A)(iii).

127.    In the costs reports, hospitals must identify "Total Program Inpatient Costs." Hospital Cost Report Form, CMS 2552-10.  These costs include the drugs and other materials necessary for inpatient care.

128.    CMS further requires a hospital's Chief Financial Officer or Administrator to certify the accuracy and completeness of the cost report.  *See id.* at 1.

129.    The hospital is required to certify that the "report and statement are true, correct, and complete" and that the "services identified" were "provided in compliance" with all laws and regulations regarding the provision of health care services.  *Id.*

130.    Thus, in determining future payment by the federal government for inpatient procedures and treatment, hospitals certify the drugs that they have used and the care and services provided to patients complied with federal laws and regulations.

131.    Relying on these certified statements, CMS determines the rate of reimbursement and allocation of funds for inpatient care.

### 2.    Medicare Part B Coverage.

132.    Medicare Part B provides payment for outpatient care and services furnished to Medicare beneficiaries.  *See* 42 U.S.C. § 1395k.

133.    Medicare Part B covers ambulatory surgical center ("ASC") services.  *See id.* § 1395k(a)(2)(F).

134.    Like Part A, designated outpatient services under Medicare Part B are subject to "packaged payment" under the prospective payment system.  42 C.F.R. § 419.1.

135.   In other words, "predetermined amounts are paid for designated services furnished to Medicare beneficiaries" during an outpatient encounter or episode of care and according to the ambulatory payment classification assigned to the outpatient services.  *Id.* § 419.2.

136.   CMS applies a standard methodology to determine the prospective payment amount for ASCs on an annual basis.  42 U.S.C. § 1395l(i)(1); 42 C.F.R. §§ 416.167 & 416.171.

137.   Payment for certain items are incorporated into the payment for the related procedures and services.  42 C.F.R. § 419.2.

138.   Among the items eligible for packaged cost reimbursement are "anesthesia, certain drugs, biologicals, and other pharmaceuticals."  *Id*. § 419.2(b)(4).

139.   Thus, like hospitals, ASCs may bill codes at fixed rates that account for most of the supplies, drugs, and other costs for a procedure or service.  *Id.* § 416.164(a)(4).

140.   While the government will reimburse an ASC under a fixed rate, the ASC must nevertheless identify certain drugs, supplies, and other costs as line items on the claim form.[25]

141.   But if the reimbursement rate for a drug exceeds a "threshold cost," the government will separately reimburse the drug.[26]  *See* 42 U.S.C. § 1395l(t)(16)(B); 86 F.R. 63458 (Nov. 16, 2021) (setting the prospective payment drug packaging threshold at $130 per-day, per-drug).

---

[25]  CMS, Medicare Claims Processing Manual (cms.gov) (last visited January 20, 2023).
[26]  *Id.*

### 3.   Claims Submitted To Medicare.

142.   In submitting claims to Medicare, all "institutional providers," such as hospitals, must use a CMS-1450 Uniform Institutional Provider Form ("CMS-1450 form").  42 C.F.R. § 424.32(b).[27]

143.   An institutional provider must submit an executed CMS-1450 form to receive payment under Medicare.  *See* 42 C.F.R. § 424.32(b).

144.   By submitting a CMS-1450 form, an institutional provider represents to a government program that it has "certif[ied]" and "verif[ied]" the patient care and billing information on which the government relies for payment.

145.   Indeed, on the first line of the claim form, providers are expressly warned (in all capital letters) that "anyone who misrepresents or falsifies essential information requested by this form may upon conviction be subject to fine and imprisonment under federal and/ or state law."

146.   For all CMS-1450 forms (regardless of the federal program), a provider represents and certifies that the claim is "correct and complete" under federal law.

147.   All non-institutional providers, such as ASCs and physicians, submit claims for reimbursement using a CMS-1500 Health Insurance Claim Form ("CMS-1500 form").  *See* 42 C.F.R. § 424.32(b).

148.   The CMS-1500 form also contains representations and certifications.

149.   By submitting a CMS-1500 form, the provider expressly certifies that the information contained in the form is "true, accurate, and complete," the provider is familiar with

---

[27]  Institutional providers include "hospitals, critical care facilities, skilled nursing facilities, a home health agency, hospice, or other similar institutions providing services to Medicare beneficiaries."  CMS, *Institutional Provider & Beneficiary Summary PUF*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/BSAPUFS/IPBS_PUF#:~:text=An%20institutional%20provider%20refers%20to,provid ing%20services%20to%20Medicare%20beneficiaries (last visited January 20, 2023).

"applicable laws, regulations, and program instructions" governing Medicare, that the claim complies with all Medicare and/or Medicaid laws, and the services identified on the form are "medically necessary."[28]

**B.**   **Medicaid.**

   **1.**   **Medicaid Coverage.**

150.    Medicaid is a joint federal-state program aimed at providing healthcare benefits to low-income individuals.  *See* 42 U.S.C. §§ 1396 *et seq.*

151.    States develop their own Medicaid programs, which are approved by CMS, subject to conditions outlined in the Social Security Act.  *Id.* § 1396a(a)-(b).

152.    The federal government then pays each State whose plan has been approved a determined amount of funds for reimbursement.  *Id.* § 1396b(a)(1).

153.    However, Medicaid will only reimburse for "covered outpatient drugs."  *Id.* § 1396r-8(k)(2).

154.    A drug is deemed a covered outpatient drug if it "is approved for safety and effectiveness" by the FDA.  42 C.F.R. § 447.502.

155.    Like Medicare Part A, most state Medicaid programs generally reimburse outpatient and inpatient drugs as part of a fixed, bundled payment based on a DRG code.  *See, e.g.*, N.Y. PBH § 2807-c.

156.    Additionally, most state Medicaid programs only reimburse for "medically necessary services" and supplies, meaning drugs that are approved by the FDA.  *See, e.g.*, N.Y.C.C.R. § 360-1.3; Tenn. Code § 71-5-144.

---

[28]  CMS, cms1500.pdf (last visited January 20, 2023).

2.      **Claims Submitted To Medicaid.**

157.     Like Medicare, institutional and non-institutional providers submit the same CMS-1450 and CMS-1500 forms for reimbursement to Medicaid.

158.     By submitting a CMS-1450 form to Medicaid, a provider "certif[ies]" that the information contained in the form "is true, accurate, and complete," and acknowledges that "payment and satisfaction of this claim will be" from government funds.

159.     Additionally, by submitting a CMS-1500 form, non-institutional providers also certify for purposes of Medicaid that "the services" identified in the form were "medically indicated and necessary" to the health of the patient.

160.     Non-institutional providers also certify that the information contained in the CMS-1500 form is "true, accurate, and complete."

C.      **TRICARE Program.**

1.      **TRICARE Coverage.**

161.     TRICARE (formerly known as CHAMPUS) is a health program administered by the U.S. Department of Defense Military Health System for active and retired members of the armed services and their dependents.  *See* 10 U.S.C. §§ 1071-1110b.

162.     Similar to Medicare Part A, TRICARE uses a DRG-based payment system for determining reimbursement for the operating costs of inpatient hospital services.  32 C.F.R. § 199.14(a)(1).

163.     TRICARE relies on the same DRGs used in the Medicare prospective payment system.  *See id.*

164.     All hospitals certified to provide services to TRICARE beneficiaries are also subject to the DRG-based system.  *See id.* § 199.14(a)(1)(ii)(D).

165.    Thus, as for Medicare Part A, procedures and care are billed under a specific code that bundles together drugs, supplies, and other services and care for a patient based on that patient's diagnosis.  None of these components are separately identified in claim forms.  *See id.* § 199.14(d)(1).

166.    For outpatient services, TRICARE reimburses claims in accordance with the Medicare outpatient prospective payment system.  *See id.* §§ 199.14(a)(6)(ii) & 199.2.

167.    For ambulatory surgical center services, TRICARE reimburses claims on the basis of prospectively determined amounts.  *See id.* § 199.14(d).

168.    As with Medicare Part B, payments are bundled according to ambulatory payment classifications, but items and services are identified on claim forms on a line item basis.

169.    But TRICARE only covers "medically necessary supplies and services."  *Id.* § 199.4(g)(15).

170.    Drugs that are "unproven" are not considered "medically necessary" under TRICARE.  *Id.*

171.    If the FDA has not approved a drug, it is considered "unproven" and thus not eligible for reimbursement.  *Id.* § 199.4(g)(15)(i)(A).

**2.      Claims Submitted To TRICARE.**

172.    In submitting claims to TRICARE, providers use CMS-1450 and CMS-1500 forms.

173.    Institutional providers "certify" that the information submitted in the claim is "true, accurate, and complete," and the services rendered were "medically indicated and necessary" for the patient.

174.     Non-institutional providers also certify compliance with all applicable laws and regulations and that the services identified were "medically necessary" under the CMS-1500 form.[29]

**D.      The Veterans Health Administration.**

       **1.      VA Coverage.**

175.     The Veterans Health Administration ("VA") covers veterans who meet certain eligibility requirements.  *See* 38 U.S.C. § 1728.

176.     Under the VA's Veterans Community Care Program ("VCCP"), certain covered veterans are entitled to hospital care, medical services, and extended care services through specified health care providers.  *See id.* § 1703.

177.     Under the VA's CHAMPVA program, survivors and dependents of certain veterans may obtain medical care from the VA.  *See id.* § 1781.

178.     Payment for inpatient hospital services is subject to a prospective payment system using the DRG codes, just like TRICARE.  *See* 38 C.F.R. § 17.55.

179.     Thus, like Medicare, procedures and care are billed under a specific code that bundles the accompanying drugs and supplies, none of which are separately identified in the claim forms.

180.     Additionally, "medications not approved by the [FDA], excluding certain exceptions to the approval requirement," are excluded from coverage under the VA's CHAMPVA program.  *Id.* § 17.272(a)(82).

---

[29]  CMS, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf. (last visited January 20, 2023).

      2.      **Claims Submitted To The VA.**

181.    When submitting claims for payment to the VA, providers must use the standard CMS-1450 and CMS-1500 forms and certifications.

## FACTUAL ALLEGATIONS

## I.    Defendants Have Falsely Marketed And Unlawfully Sold Unapproved Drugs That Pose Serious Dangers To The American Public.

182.    The Compounders – Nephron, Quva, and Ventis – hold themselves out as pharmaceutical companies that market and distribute post-surgical analgesics that compete with EXPAREL®, Relator's highly-regarded and FDA-approved drug.

183.    EXPAREL® is injected at the surgical site during surgery or shortly thereafter to "control" and reduce post-surgical pain for several days.[30]

184.    EXPAREL® works by producing "post-surgical local analgesia and as an interscalene brachial plexus nerve block to produce post-surgical regional analgesia."[31]

185.    As a result, a patient will often experience less inflammation, require little or no opioids following the procedure, and spend less time in the hospital post-surgery.

186.    EXPAREL® is used in a wide range of medical fields and for common and routinely performed procedures, including oral maxillofacial, orthopedic, and pediatric procedures.

187.    For example, EXPAREL® is used for knee, hip, and shoulder replacements, foot and ankle fracture repairs, and spine surgeries (such as spine fusions), among other common procedures.[32]

---

[30] Pacira BioSciences, *Products: Exparel*, https://www.pacira.com/products/exparel (last visited January 20, 2023).

[31] U.S. Food & Drug Admin., *Exparel: Highlights of Prescribing Information*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/022496s9lbl.pdf (last visited January 20, 2023).

188.     Critically, EXPAREL® alleviates and reduces a patient's post-surgical pain without the use of *any* opioids and their concomitant side effects and risks.

189.     Given the growing opioid crisis, EXPAREL® is a welcome tool to provide patients with relief while also "combatting the opioid epidemic" that has plagued Massachusetts, specifically, and the United States, generally.[33]

190.     EXPAREL® is the only FDA-approved drug on the market that may be used to produce post-surgical analgesia.  As such, it has undergone rigorous testing, studies, and analysis by the government and scientific community to confirm its efficacy and safety.

191.     Recognizing the demand and value of opioid-sparing analgesics, the Compounders have each sought to compete against Relator through unlawful and dangerous schemes, rather than on equal footing by undergoing the same FDA approval process.

192.     The Compounders have developed and sold new drugs for post-surgical relief without obtaining any FDA approval or commissioning any studies on the safety and efficacy of their drugs.

193.     The Compounders have advertised that they comply with the 503B exemption by relying on a cocktail of drugs – including Schedule III controlled substances – that are combined at unapproved dosages to sell their products around the country, including in Massachusetts.

194.     But none of the Compounders' drugs appear on the Drug Shortage or Clinical Need Lists in their *combined* form, or in listed dosages, as required to qualify for the 503B exemption.

---

[32]  Pacira BioSciences, *Orthopedic Surgery*, https://www.exparel.com/patient/orthopedic-surgery (last visited January 20, 2023).
[33]  Commonwealth of Massachusetts, *Fighting the Opioid Crisis*, https://www.mass.gov/fighting-the-opioid-crisis. (last visited January 20, 2023).

195.    And in some instances, the Compounders have gone even further and told providers that their drugs are FDA-approved – despite knowing for a fact that is blatantly false.

196.    The Compounders have also advertised supposed benefits associated with their drugs – none of which have undergone any meaningful or exacting government or scientific review for safety and efficacy.

197.    The Compounders have thus misled providers and the public by knowingly making false and misleading claims in their advertisements.

198.    By inappropriately and abusively attempting to rely on the 503B exemption to avoid the FDA approval process and its accompanying time and costs in circumstances where it does not apply, the Compounders have sold – and continue to sell – competing drugs that are cheaper than EXPAREL® but are not backed by any studies or analysis confirming their efficacy and safety.

199.    Nevertheless, Defendants continue intentionally and knowingly to make statements and issue publications that suggest the FDA has approved their drugs and the drugs have clinically-established benefits for patient care and treatment – all of which they know are false and designed to induce providers to purchase their drugs, the costs of which Compounders know will be reimbursed by federal health care programs.

200.    By inducing providers to purchase their drugs through false and misleading claims, Defendants are causing both the presentment of false claims and the use of false statements material to federal health care programs' payment decisions.

A. **Nephron Has Developed, Marketed, And Distributed "BKK" And "RKK"
Using Cash Payments And False Advertising Campaigns.**

1. **Nephron Has Distributed BKK, An Unapproved Compounded Drug,
In Violation Of The FDCA.**

201.    Since 2018, Nephron has marketed and sold "BKK," a competing post-surgical analgesic.

202.    BKK was first developed by Dr. Brad Worthington in 2010.

203.    Since then, Dr. Worthington and Lou Kennedy, the CEO of Nephron, have partnered to market and sell BKK across the country, including in Massachusetts.

204.    BKK consists of bupivacaine, ketorolac, and ketamine.

205.    BKK is available in a single syringe and in three 20 mL pre-filled syringes for combined use.

206.    As Nephron's advertisements explain, each BKK component is administered and "used *together* as a preventive analgesic to manage post-surgical pain." (emphasis added).[34]

207.    Each of these components poses significant risks to patient safety and health if misused or administered in an unapproved manner.

208.    Ketamine is a Schedule III controlled substance under the Controlled Substances Act ("CSA").[35]   Its use may result in physical or psychological dependence and cause serious cardiovascular, respiratory, and psychological symptoms.  *See* 64 Fed. Reg. 37673.

---

[34]  Nephron Pharmaceuticals Corporation, *Nephron Pharmaceuticals Corporation Releases Opioid Free Pain Management Product: BKK*, https://www.nephronpharm.com/news/nephron-pharmaceuticals-corporation-releases-opioid-free-pain-management-product-bkk (Dec. 13, 2018).
[35] U.S. Drug Enforcement Administration, *Controlled Substances: Alphabetical Order*, https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf, at 11 (last visited January 20, 2023).

209.   Bupivacaine can lead to central nervous system and cardiovascular system reactions, while ketorolac may cause gastrointestinal ulceration, bleeding and perforation, renal failure, liver failure, and an increased risk of serious cardiovascular conditions.

210.   The BKK "cocktail" has not been reviewed or approved by the FDA or even undergone any formal studies on its efficacy and safety.

211.   BKK is therefore a "new drug" under the FDCA.  21 U.S.C. § 321(p).

212.   But to avoid the costs and resources needed to obtain FDA approval of its new drug, Nephron instead has purported to rely on the 503B exemption to sell BKK without obtaining FDA approval.

213.    Through its "503B Outsourcing" operations, Nephron advertises that BKK does not require FDA approval for the marketing and sale of BKK because it meets the 503B exemption for sale in Massachusetts and other states.

214.   But BKK is not on the Drug Shortage List.  While the list identifies each active ingredient of BKK on an individual basis, neither BKK nor any *combination* of bupivacaine, ketorolac, and ketamine appear on the list.

215.   BKK also consists of bupivacaine, ketorolac, and ketamine injections at concentrations *not* approved by the FDA or included on the Drug Shortage List.

216.   BKK contains bupivacaine injection at 3 mg/mL, ketorolac tromethamine injection at 1.2 mg/ml, and ketamine injection at 1.2 mg/ml.

217.   The FDA has not approved these concentrations and strengths for each drug, let alone as combined into a single drug.

218.   Nor do these drugs appear on the Drug Shortage List at such concentrations.

219.    Neither the compounded BKK product nor its component bulk substances appear on the FDA's Clinical Need List.

220.    Nephron is thus knowingly marketing and selling BKK without obtaining FDA approval or complying with the narrow 503B exemption.

221.    Because BKK has not been approved by the FDA and fails to meet the 503B exemption, CMS does not consider it to be "safe and effective."  Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 1 § 30.

222.    As such, BKK is not considered "reasonable and necessary" for reimbursement under Medicare either.  *Id.* at ch. 15 § 50.4.1.

223.    For the same reasons, BKK is also not a "covered outpatient drug" under Medicaid, 42 U.S.C. § 1396r-8, or a "medically necessary" drug under TRICARE, 32 C.F.R. § 199.4(g)(15)(i)(A).

224.    The VA also should not reimburse under the CHAMPVA program for BKK because it fails to qualify for the 503B exemption.  *See* 38 C.F.R. § 17.272(a)(82).

## 2.    Nephron Has Falsely Advertised BKK's Approval Status And Safety.

225.    While Nephron claims to rely on the 503B exemption to sell BKK, its marketing and advertisements mislead the public to believe the FDA has approved BKK.

226.    Indeed, Nephron has a policy and established practice of marketing BKK in a false and misleading manner to induce providers to purchase the drug based on the mistaken belief that it is FDA-approved.

227.    For example, on its webpage advertising BKK, Nephron claims that it is "fully inspected and approved by the FDA!"

228.   That statement is false and misleading because it suggests that the FDA has reviewed and approved BKK, which it has not.



229.   And on the same webpage, Nephron advertises that BKK is "FDA APPROVED."

230.   Again, that statement is false and misleading because it suggests the FDA has reviewed and approved BKK, which it has not.



231.    Despite having conducted *zero* studies or reviews on BKK, Nephron also makes public claims and advertisements about BKK's efficacy and safety.

232.    These claims and statements have no backing or support and are therefore false and misleading insofar as they suggest that BKK has been shown to be safe and effective when it has not been.

233.    In presentations made to hospitals and outpatient facilities, Nephron has made unfounded claims about its efficacy as well as superiority over competitors, including EXPAREL®.  An example of these presentations is provided below:



234.    As stated in the presentation, Nephron makes unfounded claims that BKK "improves patient safety, satisfaction, recovery time, patient outcomes" and "patient experience." *Id.*

235.    This statement is false and misleading under the FDCA because it is not based on any clinical or other scientific trials or studies, none of which Nephron has undertaken.

236.    Nephron further claims that BKK "reduces postoperative pain, complications, risk of readmission, length of stay, patient morbidity and mortality."

237.    Again, these statements are not based on any support or studies.

238.    Tellingly, as proclaimed in all capital letters, Nephron is focused on an "INCREASED RETURN ON INVESTMENT," not patient safety or care.

239.    Nephron has further specifically compared its product to EXPAREL®.

240.    In doing so, Nephron makes additional unsupported claims about BKK's purported efficacy and safety.

241.    For example, Nephron has advertised that BKK is more "efficacious for long term analgesia" and "post operative pain," all without having any support or backing.  The below excerpt from its advertising materials confirms as much:



242.    None of Nephron's claims about BKK's efficacy and supposed benefits have been studied or validated by the FDA or other third-parties.  As such, these statements on BKK's efficacy and benefits are false and misleading.

243.    Nevertheless, Nephron has continued to make these bold false and misleading advertisements and claims, as well as others, to market and sell BKK in the United States.

244.    On information and belief, Nephron has made and presented the same or similar false and misleading advertisements and claims – through its website, sales presentations, and other media – to providers in Massachusetts to sell BKK.

### 3. Nephron Has Executed A "Grand Scheme" Aggressively To Promote And Sell BKK To Providers That Participate In Federal Healthcare Programs Using Cash Payments And Sales Pitches.

245.    For years, and as part of the company's established marketing and sales policy and practices – brazenly referred to internally as the "Grand Scheme" – Nephron has aggressively pushed BKK for use in hospitals and outpatient facilities.

246.    In addition to general advertising and promotions, Nephron uses teams of dedicated sales staff to market and distribute BKK.

247.    Nephron incentivizes its staff to sell BKK as aggressively and quickly as possible.

248.    According to former sales representatives, Nephron pays its sales staff "instant cash" upon securing orders for BKK.

249.    These cash payments are in addition to periodic bonuses and other compensation.

250.    Nephron also tells its sales staff that the FDA has approved BKK.

251.    Nephron uses in-person pitches and meetings to sell BKK to hospitals and ASCs.

252.    In fact, Nephron's CEO, Lou Kennedy, and Dr. Worthington often lead these in-person sale pitches to tout the purported benefits and efficacy of BKK.

253.    After Nephron secures an agreement to supply BKK, it provides the drug at a bulk-unit price.

254.    Because Nephron has circumvented the FDA approval process and attendant investment of time and capital, Nephron can price BKK well below competing drugs, like EXPAREL®.

255.    Nephron's own sales training "Tip Sheet" confirm this.  It sells BKK to providers for between $45 and $90 per unit.

256.    With its below-market pricing, Nephron undercuts competitive approved drugs to better promote and target BKK to hospitals and ASCs.

257.    On information and belief, Nephron has specifically targeted hospitals and outpatient centers in Massachusetts and across the United States to distribute and sell BKK.

258.    For example, on information and belief, Nephron has negotiated for Johns Hopkins Medicine hospitals to purchase BKK and other drugs for over $250,000 per month.

259.    Johns Hopkins Medicine hospitals participate in Medicare Parts A and B, among other federal healthcare programs.[36]

260.    On information and belief, Nephron has further promoted and sold BKK to hospitals and ASCs in Massachusetts, including the Boston area, as well.

261.    On information and belief, the hospital and ASCs participate in Medicare, as well as Medicaid, VA, and TRICARE programs.

262.    Thus, Nephron has distributed and placed BKK, an unapproved compounded drug that does not comply with the FDCA, as well as a controlled substance – ketamine – into interstate commerce.

263.    And even though it has not conducted a single FDA trial or study, Nephron continues to mislead the public and providers by making unvalidated claims about BKK's purported efficacy, safety, and FDCA compliance.

### 4.    BKK Has Been Recalled Numerous Times And Subject To FDA Reviews And Warnings.

264.    The obvious public risks and harms of Nephron's distribution of BKK are further heightened by the spike in recalls of its products.

---

[36] Johns Hopkins Medicine, *Insurance Plans We Accept*, https://www.hopkinsmedicine.org/patient_care/patients-visitors/billing-insurance/insurance-info.html (last visited January 20, 2023).

265.    Beginning in May 2022, Nephron's drugs, including BKK, have been recalled numerous times for sterility and contamination issues.[37]

266.    The FDA has further issued inspection reports and warning letters to Nephron.

267.    The FDA has specifically identified "lack of assurance of sterility" as the basis for recalling BKK.

268.    In those reports, the FDA has also advised Nephron that its branding and advertising practices related to the efficacy and safety of its drugs are misleading and violate the FDCA.

269.    In fact, on October 11, 2022, the FDA issued Nephron another warning letter, advising it of "significant violations" of federal requirements.  This included failure to comply with sterility and contamination prevention measures.[38]

270.    Nephron's violations are disturbing and pose serious threats to the public health and safety.

271.    Among other issues, Nephron has stored and distributed BKK using unregistered warehouses in South Carolina.  These warehouses lack climate controls and have been described as smelling of "rat poison" and "mold" inside.

272.    Additionally, Nephron has also used resins contaminated with mold in the development and distribution of BKK.

---

[37]  FDA, *Warning Letter: MARCS-CMS 644180*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/nephron-pharmaceuticals-corporation-dba-nephron-sterile-compounding-center-llc-644180-10212022 (Oct. 21, 2022); FDA, *Warning Letter: MARCS-CMS 634647*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/nephron-sc-inc-634647-10112022 (Oct. 11, 2022).
[38]  FDA, *Warning Letter: MARCS-CMS 634647*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/nephron-sc-inc-634647-10112022 (Oct. 11, 2022).

273.     On information and belief, the FDA has shut down certain of Nephron's 503B line of operations, including BKK, several years after it has already distributed and sold millions of dollars' worth of BKK across the United States.

**5.      Following Numerous Recalls And FDA Warnings, Nephron Switched To Promoting And Selling Yet Another Unapproved And Dangerous Drug – RKK – In Violation Of The FDCA.**

274.     In light of BKK's recalls and FDA warnings, Nephron has stopped selling BKK and pivoted to a new scheme.

275.     To throw the FDA off its trail, and continue its programmatic scheme to develop, promote, and sell unauthorized and dangerous drugs, Nephron has switched to hawking another unapproved drug cocktail.

276.     As of October 2022, Nephron has completely taken down all advertisements mentioning BKK from its website.

277.     But that has not stopped Nephron's efforts to profit off of the development, promotion, sale, and distribution of unapproved, unlawful, and dangerous drugs.

278.     Nephron has switched to promoting and selling "RKK" instead of BKK.  As its name suggests, RKK is very similar to BKK.

279.     RKK is a multimodal analgesic, consisting of ketorolac and ketamine.

280.     Unlike BKK, however, RKK contains ropivacaine instead of bupivacaine.

281.     Each of these component drugs pose significant risks to patient safety if administered in an unapproved manner or using improper dosages and concentrations.

282.     Like BKK, the FDA has not approved RKK and it does not fall within the 503B exemption.

283.     RKK is not on the FDA's Drug Shortage List.

284.    While injections for the three ingredients appear on the list individually, the *combination* of ropivacaine, ketorolac, and ketamine does not.

285.    The FDA has also not included RKK or the bulk substances comprising it on the Clinical Need List.

286.    RKK has not been approved by the FDA or undergone any safety and efficacy testing.

287.    RKK is therefore a "new drug" under the FDCA.  21 U.S.C. § 321(p).

288.    Because RKK lacks FDA approval and does not satisfy the 503B exemption, it is not "safe and effective" either.  Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 1 § 30.

289.    As such, RKK is not considered "reasonable and necessary" for reimbursement under Medicare.  *Id.* at ch. 15 § 50.4.1.

290.    For the same reasons, RKK is also not a "covered outpatient drug" under Medicaid, 42 U.S.C. § 1396r-8, or a "medically necessary" drug under TRICARE, 32 C.F.R. § 199.4(g)(15)(i)(A).

291.    The VA also should not reimburse for RKK under the CHAMPVA program because it fails to qualify for the 503B exemption.  *See* 38 C.F.R. § 17.272(a)(82).

292.    As with BKK, Nephron makes false and misleading statements and advertisements to promote and sell RKK.

293.    Nephron falsely advertises and markets RKK to the public as having been approved by the FDA when it has not.

294.    These representations are false and misleadingly imply RKK has been reviewed, approved, and deemed safe and effective by the FDA when it has not.

295.    On its website, Nephron repeatedly falsely advertises RKK is "approved by the FDA":



296.    At the bottom of the same webpage, Nephron even brazenly includes the FDA's watermark for approval:



297.    Nephron's advertisements falsely and misleadingly suggest that RKK has been approved by the FDA, which as Nephron knows, is false.

298.    And in the same advertisement, Nephron advertises RKK as part of its 503B Outsourcing operation, thereby suggesting that it falls under the 503B exemption for sale in Massachusetts and other states, which it does not.

299.    Thus, while Nephron has halted the sale of BKK (at least for now, while it is taking heat from the FDA), Nephron has pivoted to distributing and selling RKK in violation of the FDCA.

300.    In doing so, Nephron is distributing a controlled substance – ketamine – and further misleading the public and providers about the efficacy and safety of RKK.

301.    Nephron is falsely representing to the public, providers, and hospitals that the government has deemed its drug cocktail safe and effective when Nephron has not even submitted RKK for study, review, and approval by the FDA or any other regulator or scientific body.

**B.    QuVa Has Marketed And Sold R.E.C.K – An Unapproved And Unsafe Compounded Drug – In Violation Of The FDCA.**

**1.    R.E.C.K. Has Not Been Approved By The FDA And Fails To Qualify For The 503B Exemption.**

302.    For years, QuVa has marketed and sold "R.E.C.K.," which it advertises as a "non-opioid, ready-to-administer" injection to treat postoperative pain.[39]

303.    R.E.C.K. consists of ropivacaine, epinephrine, clonidine, and ketorolac, each of which poses significant patient health and safety risks.

---

[39]  QuVa Pharma, *R.E.C.K. Syringe*, https://www.quvapharma.com/reck-syringe-injection/ (last visited January 20, 2023).

304.    Improper administration of any one of these component drugs can lead to chest pains, hypertension, kidney failure, ulcers, and internal bleeding.[40]

305.    Despite these known risks to patient health and safety, and even though R.E.C.K. has not been approved by the FDA or undergone any testing, QuVa nevertheless aggressively markets and distributes R.E.C.K.

306.    R.E.C.K. is a "new drug" under the FDCA.  21 U.S.C. § 321(p).

307.    Like the other Compounders, QuVa purports to market and distribute R.E.C.K. under the 503B exemption throughout the United States, including Massachusetts.

308.    But R.E.C.K. does not qualify for the 503B exemption.

309.    R.E.C.K is not on the FDA's Drug Shortage List.

310.    While injections for three of four R.E.C.K. ingredients – ropivacaine, epinephrine, and ketorolac – are on the list, the combination of ropivacaine, epinephrine, clonidine, and ketorolac is not.

311.    The fourth substance, clonidine, is altogether absent from the list.

312.    R.E.C.K. further consists of ropivacaine, epinephrine, and ketorolac injections at dosages and concentrations not approved by the FDA.

---

[40]  Mayo Clinic, *Ropivacaine: Description and Brand Names*, https://www.mayoclinic.org/drugs-supplements/ropivacaine-injection-route/side-effects/drg-20065875?p=1 (last visited January 20, 2023); National Institutes of Health, *Epinephrine*, https://www.ncbi.nlm.nih.gov/books/NBK482160/#:~:text=The%20more%20common%20side%20effects,vomiting%2C%20weakness%2C%20and%20tremors.&text=Careful%20monitoring%20of%20vital%20signs,especially%20in%20patients%20with%20polypharmacy (last visited January 20, 2023); Mayo Clinic, *Clonidine: Description and Brand Names* https://www.mayoclinic.org/drugs-supplements/clonidine-oral-route/side-effects/drg-20063252?p=1 (last visited January 20, 2023).

313.    R.E.C.K. consists of ropivacaine at 2.46 mg/ml, epinephrine at 0.005 mg/ml, clonidine at .0008 mg/ml, and ketorolac injection at 0.3 mg/ml in a sodium hydrochloride solution for injection in a syringe.

314.    The FDA has not approved these concentrations of ropivacaine, clonidine, or ketamine.[41]

315.    Nor do any of the bulk substances comprising R.E.C.K. appear on the Drug Shortage List at such concentrations.

316.    The FDA also has not included the bulk drug substances comprising R.E.C.K. or R.E.C.K. as a compounded drug on the Clinical Need List.

317.    Because R.E.C.K. has not been approved by the FDA and fails to meet the 503B exemption, CMS does not consider it to be "safe and effective."  Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 1 § 30.

318.    As such, R.E.C.K. is not considered a "reasonable and necessary" drug that federal healthcare programs may reimburse.  *Id.* at ch. 15 § 50.4.1.

319.    For the same reasons, R.E.C.K. is also not a "covered outpatient drug" under Medicaid, 42 U.S.C. § 1396r-8, or a "medically necessary" drug under TRICARE, 32 C.F.R. § 199.4(g)(15)(i)(A).

320.    The VA also should not reimburse for R.E.C.K. under the CHAMPVA program because it fails to qualify for the 503B exemption.  *See* 38 C.F.R. § 17.272(a)(82).

---

[41]  The FDA has approved epinephrine at 0.005 mg/mL only if it has a base *other than sodium hydrochloride*.  But R.E.C.K. contains epinephrine with a sodium hydrochloride base, and QuVa has not obtained approval for this mixture and dosage of epinephrine.

**2.      QuVa Has Falsely Advertised That R.E.C.K. Qualifies For The 503B Exemption And Is FDA-Approved.**

321.    In advertising and marketing R.E.C.K., QuVa has made false and misleading statements about its compliance with and approval under the FDCA.

322.    QuVa advertises that R.E.C.K. is "supplied by an FDA registered 503B outsourcing facility."



323.    That statement gives the false impression that R.E.C.K. itself qualifies for the 503B exemption when in fact it does not.

324.    QuVa further misrepresents that the FDA has approved R.E.C.K.

325.    On its webpage and online pamphlets for R.E.C.K., QuVa touts its "proven FDA compliance record" and "503B Capabilities."[42]



326.    QuVa misleadingly suggests that it has obtained FDA approval for selling R.E.C.K. when in fact it has neither sought nor obtained new drug approval nor qualified for the 503B exemption.

327.    QuVa promotes and sells R.E.C.K. "in ALL 50 states."

328.    On information and belief, QuVa has made and presented the same advertisements and claims – through its website, in-person sales presentations, and other media – to providers in Massachusetts and across the country to sell R.E.C.K.

**3.    QuVa Promotes And Distributes R.E.C.K.**

329.    On information and belief, QuVa has specifically targeted hospitals and outpatient centers across the United States, including in Massachusetts, to distribute and sell R.E.C.K.

---

[42]  QuVa Pharma, *R.E.C.K*, https://20300149.fs1.hubspotusercontent-na1.net/hubfs/20300149/quvapharma_reck.pdf (last visited January 20, 2023).

330.   Using its sales force, QuVa has sold thousands of units of R.E.C.K. to hospitals and ASCs.

331.   In doing so, QuVa informs providers that R.E.C.K. complies with the FDCA and satisfies the 503B exemption to induce them to purchase R.E.C.K.

332.   On information and belief, QuVa has sold thousands of units of R.E.C.K. to ASCs and hospitals in the United States and, specifically, Massachusetts.

333.   On information and belief, the hospital and ASCs participate in Medicare, as well as Medicaid, VA, and TRICARE programs.

### C.   Ventis Has Marketed And Sold Endura-Kit™, An Unapproved And Dangerous Drug That Fails To Meet The 503B Exemption.

#### 1.   Enduracaine™ And Endura-Kit™ Are Dangerous Unapproved Drugs That Fail To Meet The 503B Exemption.

334.   Since November 2021, Ventis has marketed Enduracaine™ and Endura-Kit™ as "opioid-free post-surgical pain relief" products.[43]

335.   Enduracaine™ consists of a syringe containing epinephrine and a vial containing tetracaine and lidocaine.

336.   Ventis currently sells Enduracaine™ in a two-part injectable kit, which it markets as Endura-Kit™.

337.   Neither Enduracaine™ nor Endura-Kit™ has received FDA-approval.

338.   As such, they are each a "new drug" under the FDCA.  21 U.S.C. § 321(p).

339.   Ventis has submitted Enduracaine™ for review and approval by the FDA.

340.   In the meantime, Ventis markets, distributes, and sells Endura-Kit™ by purportedly relying on the 503B exemption.[44]

---

[43]  Ventis Pharma, *EnduraKit*, https://endurakit.com/ (last visited January 20, 2023).

341.    But Endura-Kit™ does not meet the exemption.

342.    Endura-Kit™ is not identified on the FDA's Drug Shortage List.

343.    While injections for two of the three Endura-Kit™ ingredients – lidocaine and epinephrine – are currently identified on the Drug Shortage List, the FDA has not included the *combination* of these drugs on its list.

344.    Tetracaine is altogether absent from the Shortage List and has not received FDA approval for use as an injection.

345.    The FDA has also not identified the bulk drug substances comprising Endura-Kit™ or Endura-Kit™ itself on the Clinical Need List.

346.    Because Endura-Kit™ has not been approved by the FDA and fails to fall under the 503B exemption, CMS does not consider it to be "safe and effective."  Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 1 § 30.

347.    As such, Endura-Kit™ is not considered a "reasonable and necessary" drug that may be reimbursed by Medicare.  *Id.* at ch. 15 § 50.4.1.

348.    For the same reasons, it is not considered a "covered outpatient drug" under Medicaid, 42 U.S.C. § 1396r-8, or a "medically necessary" drug under TRICARE, 32 C.F.R. § 199.4(g)(15)(i)(A).

349.    The VA also should not reimburse for Endura-Kit™ under the CHAMPVA program because it fails to qualify for the 503B exemption.  *See* 38 C.F.R. § 17.272(a)(82).

---

[44] *See id.*

2.      **Ventis Has Falsely Advertised That Endura-Kit™ Complies With The FDCA.**

350.   Ventis advertises that Endura-Kit™ is "exempt" from FDA approval under the 503B exemption.[45]



351.   But the statements on Ventis' website are misleading and give the false impression that the sale of these drugs complies with federal law when it does not.

---

[45]   *Id.*

352.     Endura-Kit™ does not fall under the 503B exemption and has not received FDA approval.

353.     As such, Ventis' advertisements on its website are false and misleading.

354.     It has also made the same misleading and false claims in other publications circulated around the country.

355.     For example, Ventis has made nearly identical claims and statements about its compliance with the FDCA in *Anesthesiology News*, one of the most widely read publications among anesthesiologists.

356.     In August 2022, Ventis placed a full-page advertisement for Endura-Kit™.

357.     In that advertisement, Ventis made false and misleading claims about Endura-Kit™'s approval:



358.     Ventis specifically claimed that Endura-Kit™ is "produced following cGMP manufacturing guidelines under 503B outsourcing standards *overseen by the FDA*" and "made from a combination of *currently FDA approved USP products*." (emphasis added).

359.    But the FDA does not oversee the production of Endura-Kit™.  Ventis' statement to the contrary is false and misleading.

360.    Ventis' representation that Endura-Kit™ is "made from a combination of currently FDA approved USP products" is also false and misleading because the FDA has not approved the use of the drugs as combined in Endura-Kit™.  To the contrary, their use as combined is *unapproved*.

361.    The advertisement also makes unsubstantiated claims about Endura-Kit™'s safety and efficacy.



362.    Ventis advertises that Endura-Kit™ is "considered safe and acceptable for use." That statement is false and misleading because the FDA has not reviewed or approved Endura-Kit™.

363.    Ventis also touts that Endura-Kit™ provides an "EXTENDED DURATION" of treatment and pain-relief compared to other drugs.

364.    That statement is false and misleading because Endura-Kit™ has not been reviewed or approved by the FDA, or undergone any studies or analysis to confirm its capabilities, efficacy, and safety.

365.    Ventis continues to make the same unsupported claims in its advertisements at tradeshows and events.

366.    At an October 2022 trade show sponsored by the American Society of Anesthesiologists, Ventis distributed advertising materials that contain additional untested and unverified statements about Endura-Kit™'s capabilities, safety, and efficacy:



367.     Ventis asserts that Endura-Kit™ has a "Quick Onset" and is "Long Lasting."

368.     That statement is false and misleading because Endura-Kit™ has not been reviewed or approved by the FDA, or undergone any scientific studies or analysis to confirm its capabilities, efficacy, and safety.

369.     Ventis further claims that Endura-Kit™ is safe for use on children.

370.     But again, that statement is false and misleading because Endura-Kit™ has not been reviewed or approved by the FDA, or undergone any studies or analysis.

371.     On information and belief, Ventis has made and presented the same advertisements and claims – through its website, in-person sales presentations, and other media – to providers in Massachusetts to sell Endura-Kit™.

> **3.      Ventis Has Engaged InfuSystem To Market and Sell Its Unapproved And Dangerous Drug.**

372.     Ventis does not have its own direct sales force.

373.     Instead, Ventis promotes and sells Endura-Kit™ through a relationship with InfuSystem and a sales force composed of 1099 contractors.

374.     InfuSystem markets and sells drugs and medical supplies.

375.     In June 2022, InfuSystem entered a National Sales and Marketing Agreement with Ventis.

376.     Under that agreement, InfuSystem markets and sells Endura-Kit™, which according to senior Ventis personnel, has resulted in month over month growth in sales of Endura-Kit™.

377.     On information and belief, InfuSystem has fully participated in developing and distributing the false and misleading advertisements for Endura-Kit™ found on Ventis' website and distributed through presentations, pamphlets, and other media.

-53-

378.    Together, Ventis and InfuSystem have developed a policy and practice to target select groups of providers and induce them to purchase Endura-Kit™ using false and misleading advertisements.

379.    Ventis uses an external sales force to contact physicians directly about using its products.

380.    InfuSystem, acting on behalf of Ventis, engages in a planned and specific advertising approach to sell Endura-Kit™.

381.    InfuSystem specifically targets anesthesiologists, ASCs, surgeons, and hospitals, as well as oral surgeons and veterinary practices.

382.    Its sales staff first approach the heads of regional anesthesiology groups (or the heads of other target groups).

383.    During these meetings, the sales staff tout Endura-Kit™'s purported benefits and provide individual samples.

384.    In pitching Endura-Kit™, InfuSystem staff make unsubstantiated and false statements to induce providers to buy it.

385.    They falsely tout their 503B exempt status to prospective customers by representing that each component of Endura-Kit™ has supposedly obtained approval.

386.    InfuSystem's sales team further describes to prospective customers that Endura-Kit™ provides over 60 hours of pain relief in the peripheral nerve space and 48-72 hours of pain relief in the cavity space.

387.    But Ventis has not completed any formal studies to back up these claims.  Nor has it commissioned any current ongoing studies to confirm the supposed efficacy and superiority of Endura-Kit™ compared to competitors, including EXPAREL®.

388.    Nevertheless, InfuSystem sales teams represent that current ongoing studies –
none of which exist – have confirmed the efficacy and superiority of Endura-Kit™ compared to
EXPAREL®.

389.    Such representations are false and misleading.

390.    The supposed studies that Ventis (through InfuSystem) touts have not been
completed, let alone been reviewed or vetted by the FDA or any other recognized body or peer-
reviewed journal.

391.    As such, it is false and misleading to market Endura-Kit™ based on
representations that medical studies have confirmed its efficacy or safety.

392.    In meetings with prospective customers, Ventis, through InfuSystem, has also
announced its intentions to substantially expand its operations and distribution of Endura-Kit™.

393.    In these meetings, Ventis has expressly stated its goal is to distribute as much
Endura-Kit™ as it can to the public.

394.    InfuSystem further advertises and promotes Endura-Kit™ to prospective
customers based on the false representation that it meets the 503B exemption.

395.    That representation is false as Endura-Kit™ does not fall under the 503B
exemption.

396.    Even worse, in some cases, salespersons also have informed providers that
Endura-Kit™ has already received FDA approval – a representation that, again, is demonstrably
false and misleading.

397.    Ventis and InfuSystem know that the FDA has not approved Endura-Kit™ and it
fails to satisfy the 503B exemption.

398.     Nevertheless, they knowingly make these false statements and advertisements about Endura-Kit™'s compliance with the FDCA to induce providers to purchase Endura-Kit™.

399.     After explaining the purported benefits of Endura-Kit™ to the heads of its target groups, the sales staff are directed to contact the support teams for the target groups.

400.     Because it has ignored the costly and time-consuming FDA new drug approval process, Ventis has its sales teams offer Endura-Kit™ at heavily-discounted prices.

401.     On information and belief, Ventis and InfuSystem have specifically targeted and sold Endura-Kit™ to hospitals and outpatient centers in Massachusetts and across the United States.

402.     On information and belief, these hospitals and ASCs participate in Medicare, as well as Medicaid, VA, and TRICARE programs.

**4.     Ventis Has Engaged Nubratori To Manufacture And Distribute Endura-Kit™.**

403.     Ventis has recently contracted with Nubratori to manufacture and distribute Endura-Kit™.

404.     Nubratori is a wholesale distributor of drugs and medical supplies.

405.     Nubratori manufactures and distributes Endura-Kit™ through an agreement with Ventis.

406.     In recent advertisements and marketing materials, Ventis has specifically identified Nubratori as an "outsourcing facility" responsible for manufacturing Endura-Kit™:



407.    According to Ventis and Nubratori personnel, Nubratori has an entire division devoted to producing and distributing Endura-Kit™.

408.    Thus, together with InfuSystem and Nubratori, Ventis is mass-producing and distributing Endura-Kit™, a drug that has not been approved by the FDA and fails to qualify for the 503B exemption.

409.    And consistent with its goal, Ventis continues to sell and distribute Endura-Kit™ across the country, including Massachusetts, at a growing rate, thereby injecting its dangerous and unapproved drug into interstate commerce and putting the public at risk.

## II.    **Defendants Have Knowingly Made False Statements To Induce Providers To Purchase Unapproved Drugs That Fail To Comply With Federal Law.**

410.    As alleged above, the Defendants have established assorted schemes to induce providers, including hospitals and ASCs, to purchase their drugs.  *Supra* ¶¶ 201-409.

411.    Defendants have engaged in targeted schemes to use false and misleading advertisements and claims about the approval, safety, and efficacy of their unapproved drugs.

412.    Through advertisements, in-person statements, promotional materials, presentations, and sales meetings, Defendants have knowingly and falsely claimed that:

- The FDA has approved their drugs, *see id.* ¶¶ 225-30, 324-38 & 350-58;

- Their drugs qualify for the 503B exemption, *see id.* ¶¶ 211-19, 321-28 & 350-60; and

- Their drugs are long-lasting, safe, and effective for use on patients, including adults and children, *see id.* ¶¶ 232-45 & 361-71.

413. In particular, Nephron has knowingly made false and misleading statements that BKK and RKK have been approved by the FDA, qualify for the 503B exemption, and reduce "postoperative pain, complications, risk of readmission, length of stay, patient morbidity and mortality" without any studies or independent validation. *See id.* ¶¶ 225-44.

414. QuVa has also knowingly made false and misleading statements that R.E.C.K. has been approved by the FDA, qualifies for the 503B exemption, and is safe and effective without any studies or independent validation. *See id.* ¶¶ 321-28.

415. Ventis, along with InfuSystem and Nubratori, have also knowingly made false and misleading statements that Endura-Kit™ has been approved by the FDA, qualifies for the 503B exemption, and is safe, effective, and "long-lasting" without any studies or independent validation. *See id.* ¶¶ 350-71.

416. All of these statements are false, misleading, and unsupported. *See id.* ¶¶ 201-24, 282-89, 302-20 & 334-49.

417. Defendants nevertheless continue to make these false and misleading advertisements and claims – fully knowing that they are false and unsupported – to further their schemes to induce providers to purchase their drugs. *See id.* ¶¶ 263, 301, 328 & 409.

418. Despite knowing their statements are false and unsupported, the Defendants deliberately withhold information from providers that plainly establishes that their affirmative statements and claims are false and unsupported.

419. In reliance on these misrepresentations and omissions, providers in Massachusetts and across the United States have purchased and used the Compounders' drugs on unsuspecting patients.

420.     Providers agree to purchase the Compounders' drugs because, in reliance on Defendants' false and misleading statements, they mistakenly believe the FDA has approved the drugs, validated their safety and efficacy, and established their compliance with the FDCA.

421.     Accordingly, Defendants' misrepresentations and omissions are critical to inducing providers to purchase their drugs.

422.     On information and belief, without Defendants' misrepresentations and omissions related to FDA approval, FDCA compliance, safety, and efficacy of the Compounders' drugs, no reasonable healthcare provider would purchase BKK, RKK, R.E.C.K., or Endura-Kit™.

423.     Defendants have knowingly made false statements and omissions to induce providers to purchase their unapproved and unlawful drugs, and those providers have in turn relied upon such false statements when seeking reimbursement from the government.

III.    **Defendants Have Knowingly Caused – And Continue To Cause – Providers To Submit False Claims And Make False Statements To The Federal Government.**

424.     Defendants have further knowingly caused providers to submit false claims and make false statements to the federal government in violation of the FCA.

A.      **Defendants Have Knowingly Caused Providers To Submit False Claims.**

425.     Providers treating federal healthcare program beneficiaries must submit claims for reimbursement to the applicable program to receive payment.

426.     To obtain payment, providers must submit the appropriate CMS claim form.

427.     Institutional providers, like hospitals, must submit a CMS-1450 form, while non-institutional providers, like ASCs, must submit a CMS-1500 form.  *Supra* ¶¶ 142-49.

428.     In submitting these forms, all providers make certifications and representations about the services and supplies, including drugs, for which the providers seek payment to the appropriate program.

-59-

429.    That includes certifications that the drugs are reimbursable and comply with applicable laws.

430.    The government relies on these certifications to adjudicate the claim and make payment.

431.    Defendants, through their schemes described above, have knowingly caused providers to submit false claims and make or use false statements material to such false claims.

432.    The providers are seeking reimbursement for the Compounders' drugs, unaware of the fact that they violate the FDCA and their claims are materially false.

433.    The Compounders' drugs are used for a host of common and routine procedures, including but not limited to orthopedic procedures such as knee, hip, and shoulder replacements, and foot and ankle fracture repairs.

434.    These are the "most common" procedures performed on federal healthcare program beneficiaries and, as such, providers annually submit tens of thousands of claims for reimbursement in connection with such procedures.[46]

435.    For example, the federal government reimburses over *$3 billion* alone for claims submitted to Medicare Part B that are tied to orthopedic procedures, like knee, hip, and shoulder replacements.[47]

---

[46]  CMS, *Comprehensive Care for Joint Replacement Model*, https://innovation.cms.gov/innovation-models/cjr (last visited January 20, 2023); *see also* CMS, *Medicare Inpatient Hospitals – by Provider and Service*, https://data.cms.gov/provider-summary-by-type-of-service/medicare-inpatient-hospitals/medicare-inpatient-hospitals-by-provider-and-service (listing the number of claims submitted for knee and joint hip replacement under Medicare Part A in 2020) (last visited January 20, 2023); CMS, *Medicare Part B Physician/Supplier National Data – CY2021 Expenditures and Services By Specialty*, https://www.cms.gov/files/document/cy-2021-expenditures-and-services-specialty.pdf (listing the amount of services, charges, and payment for orthopedic surgery under Medicare Part B).
[47]  *Id.*

436.     On information and belief, providers are using the Compounders' drugs for these common orthopedic procedures – among many other procedures – and seeking reimbursement for them through claims submitted to federal healthcare programs, including Medicare, Medicaid, TRICARE, and the VA.

437.     Thus, providers are seeking reimbursement for BKK, RKK, Endura-Kit™, and R.E.C.K. – all of which are illegal and unapproved drugs under the FDCA.

438.     By seeking reimbursement for these drugs, providers are falsely certifying claims for reimbursement, thereby submitting false claims for payment to the government and making false material statements in support of those claims.

### 1.     Medicare Certifications.

439.     Medicare only reimburses for drugs that are "*reasonable and necessary*," 42 U.S.C. § 1395y(a)(1)(A) (emphasis added) – that is, drugs that are "safe and effective," 42 C.F.R. § 405.201(b).

440.     Only drugs that have received approval from the FDA are considered "safe and effective."  Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 1 § 30.

441.     Medicare thus does not cover drugs that have not been approved by the FDA.  *Id.* at ch. 15 § 50.4.1.

442.     Thus, under the CMS-1500 form, all non-institutional providers certify to Medicare that the claim complies with all Medicare laws and the services or supplies furnished were "*medically necessary*."  *Id.* (emphasis added).

443.     Medically necessary includes "reasonable and necessary" drugs.  42 U.S.C. § 1395y(a)(1)(A).

444.     Accordingly, when a non-institutional provider submits a claim to Medicare for reimbursement of a drug, it is certifying that the drug for which it seeks reimbursement has been approved by the FDA and complies with the FDCA. *See id.*

445.     Similarly, institutional providers certify in their CMS-1450 form that the claim is "correct and complete" – meaning that the claim is correctly seeking payment for "reasonable and necessary drugs" that are reimbursable under Medicare.

446.     As these certifications make clear, compliance with the FDCA is a material requirement and condition of payment for the government.

447.     Medicare only covers drugs that the FDA has fully vetted and approved – that is, "reasonable and necessary drugs."  That promotes the animating policy objective of the FDCA – to protect the American public from being treated with unapproved and unregulated drugs.

448.     The government, through Medicare, thus does not reimburse providers for drugs that lack FDA approval or otherwise violate the FDCA.

449.     To cover and reimburse these drugs would indeed undermine the fundamental purpose and policies of the FDCA and DQSA: promoting patient health and safety by ensuring drugs used for treatment are safe and effective.

450.     But here, providers are submitting claims for reimbursement for unapproved drugs that violate the FDCA – the Compounders' drugs.

451.     None of those drugs have been approved by the FDA or satisfy the 503B exemption, and thus are not "reasonable and necessary" drugs eligible for reimbursement.

452.     The providers are thus unknowingly submitting claims for reimbursement of unlawful drugs – BKK, RKK, R.E.C.K., and Endura-Kit™.

453.    As a result, these providers are falsely certifying in their claims that the drugs are "medically necessary" and that the claims comply with federal laws and regulations.

454.    Moreover, because Medicare pays for claims under a bundled rate and code, the government has no practical or reasonable way of detecting that these providers' certifications are false, and, consequently, remains ignorant of Defendants' elaborate schemes and fraud.

455.    Because Medicare Part A does not require a provider separately to identify the drug used for a procedure, the drugs are reimbursed as part of the bundled rate that encompasses all supplies and drugs furnished for the patient's care.  *Supra* ¶¶ 117-31.

456.    Thus, the government reimburses providers for the Compounders' drugs without knowing they are not reimbursable and violate material statutory and regulatory requirements.

457.    Similarly, the government reimburses claims under Medicare Part B under a bundled rate and code.

458.    While claims submitted under Medicare Part B identify the Compounders' drugs, the government reimburses the drugs – along with all other supplies and costs – under one bundled code for the procedure.

459.    That is because the Compounders' drugs are marketed and sold for below the "threshold cost" that would require separate reimbursement.  *See id.* ¶ 141.

460.    The Compounders are able to sell their drugs for below the threshold cost because they have unlawfully circumvented the costly FDA review and approval process.  *See id.* ¶¶ 254 & 400.

461.    Thus, under Medicare Part B, the government is reimbursing providers for the Compounders' drugs through a fixed-rate.

462.     They do not have to seek separate reimbursement for these unlawful drugs, thereby reducing the possibility the government would ever realize it is paying for unapproved and unlawful drugs.  *See id.* ¶¶ 133-41.

463.     Defendants are causing providers to submit false claims to the government and make materially false statements in support of those false claims.

464.     The government is therefore being misled by these serious omissions and affirmative misrepresentations in adjudicating and paying Medicare claims.

465.     The government is paying for unapproved and unlawful drugs that it would otherwise not reimburse.

466.     Through their schemes to induce providers to buy their drugs, which they advertise as being FDA-approved and compliant with the FDCA, Defendants are knowingly inducing providers to buy their unlawful drugs.

467.     In turn, the providers believe that the Compounders' drugs are reimbursable and submit them for reimbursement to the federal government.

468.     In seeking reimbursement under their CMS-1450 and CMS-1500 forms, the providers are making the materially false representation to the government that the drugs comply with the FDCA and are reimbursable under Medicare, which they are not.

### 2.     **Medicaid Certifications.**

469.     Defendants are also causing institutional and non-institutional providers to submit false claims to Medicaid.

470.     Medicaid only reimburses "covered outpatient drugs of a manufacturer."  42 U.S.C. § 1396r-8.

471.    A drug is deemed a covered outpatient drug if it "is approved for safety and effectiveness" by the FDA.  42 C.F.R. § 447.502.

472.    Thus, drugs that lack FDA approval and do not comply with the FDCA, like the Compounders' drugs, are not properly reimbursable under Medicaid.

473.    Provider reimbursement claim forms account for this limitation by requiring providers to certify that the drugs effectively fall within the "covered outpatient drug" status.

474.    For CMS-1500 forms, non-institutional providers certify that the services and drugs identified in the form are "medically indicated and necessary" and comply with all Medicaid laws and regulations.

475.    Covered outpatient drugs fall within the scope of medically indicated and necessary and are therefore reimbursable.

476.    For CMS-1450 forms, an institutional provider "certif[ies]" that the information contained in the form "is true, accurate, and complete."

477.    That certification represents that provider is seeking reimbursement for drugs that may properly be reimbursed under Medicaid for a covered outpatient drug.

478.    Like claims submitted to Medicare, these certifications show that compliance with the FDCA is a material requirement and condition of payment for the government.  *Supra* ¶¶ 142-49.

479.    The government thus does not reimburse providers under Medicaid for drugs that lack any FDA approval or otherwise violate the FDCA.

480.    State Medicaid programs vary on whether they use a bundled billing model.  But most programs adopt a prospective bundled payment system for inpatient and outpatient services, thereby bundling payment for drugs used for a procedure.

481.    Regardless of the payment model, providers are submitting claims for reimbursement for unapproved drugs that violate the FDCA – the Compounders' drugs.

482.    None of those drugs have been approved by the FDA or satisfy the 503B exemption, and thus are not "covered outpatient drugs" eligible for reimbursement.

483.    Nevertheless, providers unknowingly are submitting these unapproved and violative drugs – BKK, RKK, R.E.C.K., and Endura-Kit™ – for reimbursement.  As a result, they are falsely certifying in their forms that the drugs are properly reimbursable.

484.    Through their established schemes of inducing providers to buy their drugs, which they advertise as being FDA-approved and complying with the FDCA, Defendants are knowingly inducing providers to buy their unlawful drugs.

485.    In turn, providers seek reimbursement for these drugs, believing the Compounders' drugs are approved and comply with the FDCA, and thus, are reimbursable.

486.    In seeking reimbursement under their CMS-1450 and CMS-1500 forms, the providers are falsely certifying to the government that the drugs comply with the FDCA and are reimbursable under Medicaid, which they are not.

487.    And because of the bundled-code arrangement that applies to Medicaid programs, the government cannot reasonably or practically detect that it is paying for unapproved and unlawful drugs through Medicaid.

### 3.    TRICARE And VA Certifications.

488.    Defendants have also caused providers to submit false claims to TRICARE and the VA.

489.    TRICARE only covers "medically necessary supplies and services."  32 C.F.R. § 199.4(g)(15).

490.     Drugs that are "unproven" are not considered "medically necessary" under TRICARE. *Id.*

491.     If a drug has not received FDA approval, it is considered "unproven" and thus not eligible for reimbursement. *Id.* § 199.4(g)(15)(i)(A).

492.     Accordingly, providers make certifications for claims submitted to TRICARE that align with the "medically necessary" limitation.

493.     For CMS-1450 forms, institutional providers certify that the drugs and services rendered are "medically indicated and necessary."

494.     Similarly, for CMS-1500 forms, non-institutional providers certify that the drugs and services are "medically necessary."

495.     While the CMS-1450 and CMS-1500 forms do not contain certifications specific to the VA, all providers certify that the claim is, at a minimum, "true, accurate, and complete." That includes requests for reimbursement of drugs and supplies that are properly reimbursable.

496.     Under the VA's CHAMPVA program, only medications that are approved by the FDA or comply with the FDCA fall under the program's coverage. *See* 38 C.F.R. § 17.272(a)(82).

497.     Thus, in submitting claims under CHAMPVA, providers certify that the claim properly seeks payment for reimbursable drugs.

498.     These certifications show that compliance with the FDCA is a material requirement and condition of payment for the government. *Supra* ¶¶ 117-81.

499.     The government thus does not reimburse providers under TRICARE or CHAMPVA for drugs that lack FDA approval or otherwise violate the FDCA.

500. But here, providers are submitting claims for reimbursement for unapproved drugs that violate the FDCA – the Compounders' drugs.

501. None of those drugs have been approved by the FDA or satisfy the 503B exemption, and thus are not "medically necessary" drugs eligible for reimbursement under TRICARE or the VA.

502. But the providers unknowingly are submitting these unapproved and violative drugs – BKK, RKK, R.E.C.K., and Endura-Kit™ – for reimbursement. As a result, they are falsely certifying in their claims that the drugs are "medically necessary."

503. Moreover, because TRICARE and the VA pay for claims under a bundled-rate and code, the federal government has no reasonable or practical way of detecting Defendants' fraud.

504. Because TRICARE and VA do not require a provider separately to identify the drug used for a procedure, the drugs are reimbursed as part of the bundled rate that encompasses all supplies and drugs furnished for the patient's care. *Supra* ¶¶ 166-68 & 178-79.

505. Thus, providers are being reimbursed for the Compounders' drugs without the government even realizing they are not reimbursable and violate material statutory and regulatory requirements.

506. The government is therefore being misled by Defendants' scheme.

507. The government is paying for unapproved and unlawful drugs that it otherwise could and would not reimburse.

508. Defendants are causing providers to submit false claims to the government and misleading the government.

509.    Through their established schemes of inducing providers to buy their drugs, which they advertise as being FDA-approved and complying with the FDCA, Defendants are knowingly inducing providers to buy their unlawful drugs.

510.    In turn, the providers believe that the Compounders' drugs are reimbursable.

511.    In seeking reimbursement under their CMS-1450 and CMS-1500 forms, the providers are falsely certifying to the government that the drugs comply with the FDCA and are reimbursable under TRICARE and the VA, which they are not.

512.    And because of the bundled-code arrangement, the government cannot reasonably or practically detect that it is paying for unapproved and unlawful drugs through the TRICARE and VA programs.

**B.      Defendants Have Knowingly Caused Hospitals To Make False And Material Statements.**

513.    Besides knowingly causing providers to submit false claims, Defendants are causing hospitals to make false statements to the government through annual cost reports.

514.    As explained above, CMS calculates predetermined amounts for reimbursement using DRG codes and rates that apply to claims submitted to Medicare, TRICARE, and the VA. *Supra* ¶¶ 122-24.

515.    To determine the DRG rates, hospitals must submit cost reports to CMS that are used to adjust DRG rates for the following year as part of the prospective payment system. *See id.* ¶¶ 125-29.

516.    In the costs reports, hospitals must identify the drugs and other materials necessary for inpatient care and certify the report's accuracy and completeness.

517.    A hospital's CFO or the other executive certifies that the "report and statement are true, correct, and complete" and that the "services identified" were "provided in compliance" with all laws and regulations regarding the provision of healthcare services.  *Id.*

518.    Thus, in determining future payment by the federal government for inpatient procedures and treatment, hospitals certify the costs of care and services, including drugs, that they have incurred and that such care and services comply with federal laws and regulations.

519.    The government further relies on these reports and certifications to determine the rate of reimbursement and funds to allocate for inpatient care.

520.    Material to that reimbursement calculation and the report certifications is that any drugs identified comply with the FDCA and are therefore reimbursable.

521.    As explained above, this is a material requirement and condition of payment for the government in all of its key healthcare programs, including Medicare, Medicaid, TRICARE, and the VA.  *Supra* ¶¶ 113-16, 153-56, 169-71 & 180.

522.    The same goes for how the government determines how much money to allocate for reimbursement of drugs.  The government will only pay for drugs that are properly reimbursable, and that includes drugs that comply with the FDCA.  *See id.* ¶¶ 113-16, 153-56, 169-71 & 180.

523.    But Defendants have caused hospitals falsely to certify statements in the reports.

524.    In submitting cost reports, hospitals are unknowingly certifying that the drugs identified in the report for reimbursement "compl[y]" with federal laws and regulations, including where the hospitals have identified the Compounders' drugs in the reports.

525.    These false certifications are therefore material to the government's decision to reimburse.

526.    But the Compounders' drugs do not comply with federal law.  *See id.*
¶¶ 220, 282, 315-16 & 337-45.

527.    The FDA has not approved them and they fail to fall under the 503B exemption.
*See id.* ¶¶ 308-17 & 337-45.

528.    As such, the government is making critical financial calculations and
determinations for each year based on the reimbursement of unapproved and unlawful drugs.

### IV.    Defendants' Fraudulent Conduct Has Caused The Government To Pay False Claims, Resulting In Serious Economic And Grave Non-Economic Harms.

529.    As explained above, Defendants have knowingly caused providers to submit false
claims and statements to the federal government.

530.    Defendants have engaged in their schemes and conduct *for years*.

531.    On information and belief, Defendants have knowingly caused the submission of
*hundreds of thousands* of claims, if not more, to the government for reimbursement.

532.    Indeed, each and every single claim that has sought reimbursement for the
Compounders' drugs is false.

533.    As a result, on information and belief, the government has likely paid tens of
millions of dollars – if not more – in false claims for the reimbursement of drugs that are
unapproved and fail to comply with the FDCA.

534.    Aside from the economic harms and theft of the federal treasury, the payment of
these claims has also put the public in serious danger.

535.    The Compounders' unapproved drugs, which are made up of controlled
substances, pose significant health risks and are being widely distributed into interstate
commerce based on false promises of safety and efficacy without any serious oversight or
regulation.

536.   None of the Compounders' drugs have been verified for safety or efficacy.

537.   Allowing Defendants to continue with their wide-ranging and unlawful scheme will result in the payment of more false claims and put the American public further in harm's way.

## CAUSES OF ACTION

### COUNT I
**False Claims Act: Causing Presentment Of False Claims
(31 U.S.C. § 3729(a)(1)(A))**

538.   Relator re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 537 of the Complaint as if fully set forth herein.

539.   The FCA prohibits any person or entity from "knowingly" presenting, or causing to be presented, a false or fraudulent "claim" for payment.  *See* 31 U.S.C. § 3729(a)(1)(A).

540.   The FCA defines "claim" broadly to include any "request or demand" for "money or property" that is "presented to an officer, employee, or agent of the United States."  *Id.* § 3729(b)(2).

541.   The CMS-1450 and CMS-1500 forms submitted by providers to the government for payment are "claims" under the FCA.

542.   "Knowing" and "knowingly" means that a person or entity has actual knowledge of the information, "acts in deliberate ignorance of the truth or falsity" of the information, or acts with "reckless disregard of the truth or falsity" of the claim. *Id.* § 3729(b)(1).

543.   The FCA does not, however, require any "proof of specific intent to defraud."  *Id.*

544.   Defendants have knowingly caused providers to submit false or fraudulent claims. *Id.* § 3729(a)(1).

545.   For years, Defendants have developed, marketed, and distributed drugs that lack FDA approval and fail to comply with the 503B exemption in violation of the FDCA.

546.     None of these drugs – BKK, RKK, R.E.C.K., and Endura-Kit™ – comply with the FDCA.

547.     Having actual knowledge that their drugs have not been approved by the FDA and fail to qualify for the 503B exemption, or recklessly disregarding the truth of this information, Defendants have nevertheless used false and misleading advertisements to induce providers to purchase their drugs.

548.     In doing so, providers have purchased and used drugs that have been falsely advertised as complying with the FDCA.  *Id.* § 3729(b)(4).

549.     Whether the drugs comply with the FDCA is critical to the providers' purchasing decisions and use of the drugs.

550.     Believing the drugs comply with the FDCA, providers have in turn submitted claims to federal healthcare programs – specifically Medicare, Medicaid, TRICARE, and VA – for reimbursement of these drugs.

551.     In doing so, the providers are falsely certifying to the Government that the Compounders' drugs comply with the FDCA and are thus reimbursable.

552.     Pursuant to the CMS-1450 form, institutional providers:

- Certify that the claims are "correct and complete" to all government healthcare programs;

- Certify to Medicaid that the information in the claim is "true, accurate, and complete"; and

- Certify to TRICARE that the information in the claim is "true, accurate, and complete" and the drugs used were "medically indicated and necessary."

553.     Pursuant to the CMS-1500 form, non-institutional providers:

- Certify to Medicare that the information in the claim is "true, accurate, and complete," complies with all Medicare and Medicaid laws and regulations, and the drugs furnished are "medically necessary";

- Certify to Medicaid that the drugs used were "medically indicated and necessary," and the information in the claim is "true, accurate, and complete";

- Certify to TRICARE that the drugs used are "medically necessary" and the claim complies with all applicable laws and regulations; and

- Certify to all government healthcare programs that the information in the claim is "true, accurate, and complete."

554.    Pursuant to these certifications, providers certify to the government that the drugs comply with the FDCA and are reimbursable under the appropriate program.

555.    But as alleged, none of the Compounders' drugs – BKK, RKK, R.E.C.K., or Endura-Kit™ – comply with the FDCA or are reimbursable under federal law.

556.    None of these drugs have been approved by the FDA or fall under the 503B exemption, a fact that Defendants know when they advertise and sell the drugs to providers.

557.    As such, BKK, RKK, R.E.C.K., and Endura-Kit™ are not reimbursable as:

- "[R]easonable and necessary" drugs under Medicare;

- "Covered outpatient" drugs under Medicaid;

- "Medically necessary" drugs under TRICARE; and

- Approved and FDCA-compliant drugs under the VA/ TRICARE.

558.    For adjudicating and paying claims, compliance with the FDCA is material to the federal government.

559.    The FCA defines "material" as "having a natural tendency to influence" the payment or receipt of money. *Id.*

560.    Compliance with the FDCA is material.

561.    As the certifications and federal reimbursement regulations make clear, the government will only pay for drugs that comply with the FDCA – that is, those that are approved

by the FDA or comply with statute's specific exemption criteria, all of which are designed to protect the American public.

562.     To cover and reimburse unapproved drugs that violate federal law would indeed undermine the animating and fundamental purpose and policies of the FDCA and DQSA to ensure that drugs prescribed to patients are safe and effective.

563.     Had the government known that providers' claims submitted for the Compounders' drugs were for unapproved drugs for which no exemption applied, the government would not have reimbursed those claims.

564.     But through their ongoing, fraudulent, and knowing misconduct, Defendants have caused the government unwittingly to approve and pay claims for their unapproved and unlawful drugs.

565.     On information and belief, the federal government has approved and paid, and continues to approve and pay, hundreds of thousands of claims for reimbursement of BKK, RKK, R.E.C.K., and Endura-Kit™.

566.     The government has therefore paid tens of millions – if not more – for claims seeking reimbursement of BKK, RKK, R.E.C.K., and Endura-Kit™.

567.     Accordingly, through the acts described above, Defendants have violated the FCA by knowingly causing the presentment of false or fraudulent claims for payment by the federal government.  *See* 31 U.S.C. § 3729(a)(1)(A)

568.     As a result of Defendants violations of the FCA, the United States has sustained damages and is entitled to treble damages and a civil monetary penalty for each false or fraudulent claim.  *See id.* § 3729.

569.    The government has suffered damages by paying for unlawful drugs that are not safe and effective and for which no reimbursement is properly due.

570.    Relator is further entitled to a percentage of the proceeds recovered or assessed in this action, as well as its attorney's fees and costs.  *See id.* § 3730.

**COUNT II**
**False Claims Act: Causing Presentment Of False Statements**
**(31 U.S.C. § 3729(a)(1)(B))**

571.    Relator re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 537 of the Complaint as if fully set forth herein.

572.    The FCA prohibits any person or entity from "knowingly" causing to be made or used a "false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).

573.    Through their ongoing misconduct and violations of federal law, Defendants have knowingly caused institutional providers, specifically hospitals, to submit false statements and records to the federal government that are material to the payment of false claims they have caused to be submitted.

574.    As required by CMS, hospitals must submit cost reports that identify the drugs and their costs for treating patients.  These reports and costs are used by CMS to determine the reimbursement rates and DRG code values for the following year.  *Supra* ¶¶ 125-31.

575.    In submitting these costs reports, a hospital's CFO certifies that the "report and statement are true, correct, and complete" and that the "services identified" were "provided in compliance" with all laws and regulations regarding the provision of health care services.  *Id.*

576.    Thus, in determining future payment by the federal government for inpatient procedures and treatment, hospitals certify the costs of care and services, including drugs, that they have incurred and that such care and services comply with federal laws and regulations.

577.    The government further relies on these reports and certifications to determine the rate of reimbursement and funds to allocate for inpatient care.

578.    Material to that reimbursement calculation and the report certifications is that any drugs identified comply with the FDCA and are therefore reimbursable.

579.    As alleged above, this is a material requirement and condition of payment for the government in all of its key healthcare programs, including Medicare, Medicaid, TRICARE, and the VA.  *Supra* ¶¶ 113-16, 153-56, 169-71 & 180.

580.    The same goes for how the government determines how much money to allocate for reimbursement of drugs.

581.    The government will only pay for drugs that are properly reimbursable, and that includes drugs that comply with the FDCA.  *See id.* ¶¶ 113-16, 153-56, 169-71 & 180.

582.    The cost reports are also material to the government's payment of claims.  The cost reports indicate at what rate the government will reimburse the drugs upon receipt of a provider's claim.

583.    The government further allocates funds to reimburse these drugs based on the quantities and costs identified in the reports.

584.    The cost reports therefore have a "natural tendency to influence" the payment of provider claims.  31 U.S.C. § 3729(b)(4).

585.    Defendants have knowingly caused hospitals falsely to certify statements from the reports.

586.    In submitting cost reports, hospitals are unknowingly certifying that the drugs identified in the report for reimbursement "compl[y]" with federal laws and regulations, including where the hospitals have identified the Compounders' drugs in the reports.

587.     But the Compounders' drugs do not comply with federal law.  *Supra* ¶¶ 220, 282, 314-15 & 337-45.

588.    The FDA has not approved them and they fail to fall under the 503B exemption. *See id.* ¶¶ 210-15,282-86, 315-16 & 337-45.

589.    As such, the government is making critical financial calculations and determinations for each year based on the reimbursement of unapproved and unlawful drugs.

590.    This false certification is clearly "material" for purposes of FCA liability, as admitting that the Compounders' drugs violate the FDCA necessarily would influence the government's payment decision.  31 U.S.C. § 3729(b)(4).

591.    Relying on the costs and information in the reports, the government has paid, and continues to pay, false claims to reimburse for the Compounders' unapproved and unlawful drugs.

592.    Accordingly, through the acts described above, Defendants have violated the FCA by knowingly causing to be made and used a false record material to a false or fraudulent claim for payment by the federal government.  *See id.* § 3729(a)(1)(B)

593.    As a result of Defendants' violations of the FCA, the United States has sustained damages and is entitled to treble damages, plus a civil monetary penalty for each false or fraudulent claim.  *See id.* § 3729.

594.    The government has suffered damages by paying for unlawful drugs that are not safe and effective and for which no reimbursement is properly due.

595.     Relator is further entitled to a percentage of the proceeds recovered or assessed in this action, as well as its attorney's fees and costs.  *See id*. § 3730.

<div align="center">**PRAYER FOR RELIEF**</div>

WHEREFORE, Relator prays for this Court to enter judgment against Defendants, granting the following relief:

1.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, *see* 31 U.S.C. §§ 3729 *et seq*;

2.     That the Court assess civil penalties of not less than $12,537 and not more than $25,076 for each violation of 31 U.S.C. § 3729 to be proven at trial;

3.     That Relator be awarded the maximum amount permitted under the FCA;

4.     That Relator be awarded attorney's fees and costs, as permitted by law;

5.     That the United States and Relator be awarded pre-judgment and post-judgment and other interest on all monetary damages, as permitted by law; and

6.     Any and all such further relief that the Court deems just and proper.

<div align="center">**DEMAND FOR JURY TRIAL**</div>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a trial by jury in this action on all issues so triable as of right.

Dated: January 20, 2023

<div style="margin-left:30%">

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

By:    */s/ Lisa M. Lewis*
        Lisa M. Lewis (Bar No. 647337)
        30 Rockefeller Plaza
        New York, New York 10112-0015
        Telephone:  212-653-8700
        Facsimile: 212-653-8701
        lmlewis@sheppardmullin.com

        Paul Werner  (*pro hac vice* to be filed)
        Joseph Jay (*pro hac vice* to be filed)
        Scott Liebman (*pro hac vice* to be filed)
        Imad Matini (*pro hac vice* to be filed)
        2099 Pennsylvania Avenue NW
        Washington, D.C. 20006
        Telephone: 202-747-1931
        Facsimile: 202-747-3817
        pwerner@sheppardmullin.com
        jjay@sheppardmullin.com
        sliebman@sheppardmullin.com
        imatini@sheppardmullin.com

        *Attorneys for Relator-Plaintiff*

</div>